Filed 2/25/16 Certified for Publication 3/25/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re H.R., a Person Coming Under the Juvenile Court Law. | B263868 (Los Angeles County Super. Ct. No. DK08465) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.C., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Zeke Zeidler. Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Alleged father E.C. (father) appeals from the juvenile court's jurisdiction and disposition orders over the child H.R. The court found father to be H.R.'s alleged father but declined to designate him H.R.'s biological father. Father contends this was error, and moreover, the court erred in sustaining an allegation that he failed to provide support. We affirm.

## FACTS AND PROCEDURE

In November 2014, the Los Angeles County Department of Children and Family Services (DCFS) removed H.R. and his half sister J.R. from the home of mother, L.R. DCFS acted based on allegations of domestic violence between mother and her companion, Alejandro F.,[1] physical abuse of J.R. by mother, domestic violence between Alejandro F. and the children's maternal grandfather, alcohol abuse by mother, and mother's leaving the children home alone for extended periods of time. H.R. was four years old at the time of removal.

Mother declined to give DCFS any information about father when interviewed by DCFS for the detention report, including his name, birth date, address, telephone number, or any other identifying information. She said father had not been involved with H.R. since his birth. She told the social worker "to find out [about him] without her help." She later imparted slightly more information about father—she thought he was incarcerated in Arkansas and might be in the process of deportation. But she still refused to provide his name.

Alejandro F. reported he was the biological father of J.R. but not H.R. He viewed H.R. as his child, however, because he had raised him. Alejandro F. and mother had been in an "on and off" relationship for 10 years. He did not know the name of H.R.'s biological father.

By late November 2014, mother had disclosed more information about father. She completed a "parentage questionnaire" that disclosed his name, birth date, and the

---

[1]     Alejandro F. is J.R.'s father. He and mother are not parties to this appeal.

name of his cousin in Arkansas who might help locate him.  The questionnaire indicated father was not present for H.R.'s birth and did not sign his birth certificate.  Also, he and mother did not live together at the time of H.R.'s birth, father had not held himself out as H.R.'s father, and he had not received H.R. into his home.  A paternity test had not been conducted.

At the detention hearing, the court deferred paternity findings so that DCFS could notice both fathers and give them the opportunity to appear.  It ordered DCFS to conduct a due diligence investigation for father, including efforts to locate his cousin, Leslie Z., in Arkansas.

DCFS filed an amended petition in December 2014 adding allegations that father had failed to provide H.R. with the necessities of life.  (Welf. & Inst. Code, § 300, subds. (b), (g).)[2]  The court ordered DCFS to provide evidence of due diligence in attempting to locate father and set an arraignment hearing on the amended petition.  DCFS was to follow up with father's cousin and properly notice him of the arraignment hearing.

When interviewed for the jurisdiction/disposition report, mother reported that father had not provided for H.R. and reiterated that he had not had any contact with H.R.

DCFS tracked down Leslie Z. in Arkansas, who put the social worker in touch with father's mother (paternal grandmother) in late December 2014.  Paternal grandmother, also in Arkansas, reported that father was in Louisiana and in the process of being deported to El Salvador.  Paternal grandmother stated that she and father did not believe H.R. was the biological son of father because mother was with other men at the time of H.R.'s conception.

Father contacted the social worker at the end of December 2014.  He was, indeed, detained in Louisiana and expected to be deported to El Salvador in January

---

**2**       Undesignated statutory references are to the Welfare and Institutions Code.

2015. The social worker informed him of the arraignment and adjudication hearings scheduled for January 2015. Father thought he might be in El Salvador by then, but said he would keep DCFS up to date with his status and location. DCFS also sent father certified mail notice of the January arraignment and adjudication hearings.

DCFS's investigation revealed that father had an extensive criminal history. Father admitted to using marijuana and cocaine. The last time father had seen mother was in 2010, when she was eight or nine months pregnant with H.R. He and mother were never in a relationship; they "hooked up" four or five times. He admitted the allegations of the amended petition were true in that he never cared for H.R. or provided him with the necessities of life. He was incarcerated when H.R. was born and then was deported to El Salvador (after which he came back to the United States).

Father did not appear at the January 2, 2015 arraignment hearing. The court appointed counsel for him.

Paternal grandmother spoke with the social worker in mid-January 2015 and indicated she would be willing to care for H.R. and his half sister if they could not reunify with their parents. She was open to DCFS assessing her home in Arkansas.

At the adjudication hearing on January 20, 2015, father's counsel made a general appearance for him. The court found father to be H.R.'s alleged father. Father denied the petition. He requested a DNA test, which the court granted. It continued the adjudication to a later date.

H.R. submitted to DNA testing on January 22, 2015. On the same date, father called the social worker and reported that he was deported to El Salvador on January 19, 2015. He had not provided a DNA sample before leaving the United States. When DCFS asked for a contact number or address in El Salvador, father did not provide either.

At the next hearing, father's counsel requested that the court elevate father from alleged father to biological father. The court denied the request and ordered counsel to file briefing addressing whether the court had discretion to award family reunification services to an alleged father.

4

At the continued adjudication hearing, father's counsel called mother to testify. Mother said father was the biological father of H.R.; she never told him that he was *not* the biological father of H.R. There was nobody else who could be H.R.'s father. She and father had a sexual relationship around the middle of 2009. She did not have a sexual relationship with anyone else during the period when she became pregnant with H.R. Father told her he did not think he was H.R.'s biological father when she informed him of the pregnancy. She told him she was thinking about terminating the pregnancy, but he told her to keep the baby. She saw father again when she was seven months pregnant and visited his family in Arkansas. At that time, he agreed with mother that he fathered H.R.

Mother did not want father to see H.R. after he was born because she was angry that he initially denied being H.R.'s father. And after H.R. was born, father vacillated between denying and acknowledging that he fathered H.R. Around the time H.R. was born, mother learned through father's aunt that he again denied being H.R.'s father. Then, when H.R. was a month old, he claimed to be H.R.'s father, which mother again learned through his aunt. Mother had not heard differently since then.

Father's counsel argued that the court should dismiss all allegations against father because, as an alleged father, he was not entitled to care, custody, or control of H.R., and he therefore had no ability to place the child at risk of harm. Counsel acknowledged father had a right to try to elevate his status. The court responded that this was "one reason" why it should not dismiss the allegations—because if he rose to a presumed father, the court would "need to know what the issues were and what he needs to be resolving." Counsel for H.R. noted that father had a history of going back and forth on holding himself out as the father, and he had asked that the court order DNA testing.

The court ruled: "The previous finding that [father] is an alleged father and not a biological father remains." It ordered DCFS to explore ways to obtain a DNA sample from father in El Salvador. The court sustained various counts of the amended petition relating to mother's and Alejandro F.'s conduct. It also sustained the

5

allegation that father had failed to provide the necessities of life for H.R. under section 300, subdivision (g), but dismissed the same allegation under subdivision (b). The court ordered DCFS to initiate an Interstate Compact on Placement of Children (ICPC) (Fam. Code, § 7900 et seq.) with Arkansas to evaluate the home of paternal grandmother. The court denied family reunification services for father, but it granted him monitored visits, telephone calls, or Skype calls at least once a week for one hour. Father filed a notification of mailing address with an address in El Salvador.

The court discussed with father's counsel whether it should relieve her. Counsel indicated that she should continue representing father because the court ordered DCFS to explore obtaining a DNA sample and initiate the ICPC for paternal grandmother's home, and father wished to elevate his status. The court agreed and did not relieve counsel.

## DISCUSSION

Father contends the court erred in denying him biological father status and reunification services. Notwithstanding his claim to biological father status, father also argues that as an alleged father, the court could not base jurisdiction on his failure to provide support for H.R. We reject these contentions.

### 1. *Challenge to the Court's Paternity Determination*

Dependency proceedings differentiate between "alleged," "biological," and "presumed" fathers. (*In re D.P.* (2015) 240 Cal.App.4th 689, 695.) A man who *may* be the father of a child but has not established his biological paternity, or achieved presumed father status, is an alleged father. (*Ibid.*) A biological father has established his paternity, but he has not established that he is the child's presumed father according to Family Code section 7611.[3] (*In re Kobe A.* (2007) 146 Cal.App.4th

---

[3] Under Family Code section 7611, the factors bearing on presumed father status include: (1) whether the man and the child's natural mother married or attempted to marry; (2) whether the couple was cohabitating; (3) whether the child's birth certificate named the man as the father; (4) whether the man pays child support, either

6

1113, 1120.)  A father's rights and the extent to which he may participate in dependency proceedings hinge on his paternal status.  (*In re D.P., supra*, at p. 695.)  "An alleged father has limited due process and statutory rights."  (*Ibid.*)  "He is not entitled to appointed counsel or to reunification services."  (*In re Kobe A., supra*, at p. 1120.)  "Due process for an alleged father requires only that he be given notice and an opportunity to appear and assert a position and attempt to change his paternity status . . . ."  (*Ibid.*)  The court has the discretion to grant reunification services to a biological father "if the court determines that the services will benefit the child."  (§ 361.5, subd. (a); see *In re Kobe A.*, at p. 1120.)  Presumed father status ranks highest and entitles the father to appointed counsel, custody (assuming the court has not made a detriment finding), and reunification services.  (*In re D.P.*, at p. 695; *In re Kobe A.*, at p. 1120.)

"At the detention hearing, or as soon thereafter as practicable, the court shall inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers."  (§ 316.2, subd. (a).)  Once identified, any alleged father should receive notice by certified mail of the proceedings and the fact that the proceedings could result in the termination of parental rights.  (§ 316.2, subd. (b).)  The alleged father should also receive Judicial Council form JV-505.  (*Ibid.*)  Among other things, form JV-505 allows the alleged father to declare he is not the father of the child, declare he does not know whether he is the father and request DNA testing, or declare that he believes he is the father and request that the court enter a judgment of parentage.  If the alleged father appears in court "and requests a judgment of parentage on form JV-505," the court shall determine:  "(1) Whether that person is the biological parent of the child; and  [¶]  (2) Whether that person is the presumed parent of the

---

voluntarily or by court order; (5) whether the man receives the child into his home and openly holds out the child as his natural child; and (5) whether the man signed a voluntary declaration of paternity.  (Fam. Code, §§ 7540, 7573, 7611, subds. (a)-(d).)

7

child, if that finding is requested."[4] (Cal. Rules of Court, rule 5.635(h).) To determine parentage, the court may order genetic testing, or it may base the determination on testimony, declarations, or statements of the alleged parents. (Rule 5.635(e)(2), (3); *In re D.P., supra*, 240 Cal.App.4th at p. 696.)

We review the court's parentage determination for substantial evidence. (*In re Cheyenne B.* (2012) 203 Cal.App.4th 1361, 1371; *S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023, 1031.) We do not ourselves reweigh the evidence, resolve conflicts in the evidence, or assess credibility. Rather, we "'determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment.'" (*In re Cheyenne B., supra*, at p. 1371; see *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

In this case, substantial evidence supported the court's determination that father was H.R.'s alleged but not biological father. On the one hand, mother has consistently asserted father's biological paternity, and she testified she did not have a sexual relationship with anyone else during the period when she conceived H.R. On the other hand, paternal grandmother said she and father did not believe H.R. was father's child because mother was with other people at the time of H.R.'s conception. Further, although father is now claiming biological paternity, he has vacillated, denying it when mother told him of her pregnancy, and denying it again when H.R. was born. In other words, the evidence was conflicting—it seemed possible father was H.R.'s biological father, but it also seemed possible he was not. Thus, there was substantial evidence to support the determination that father was the alleged father and not the biological father. We are not entitled to reweigh the evidence.

---

[4] The record does not contain a form JV-505 submitted by father. After his counsel appeared, it seems she at least orally requested a determination of parentage.

It is entirely probable that this is not the court's last word on the matter. Father retains the right to file a section 388 petition to change his paternity status, or the court may very well change its order sua sponte. The court's orders (1) that DCFS continue to pursue a DNA sample from father in El Salvador, (2) that father's counsel was not relieved, (3) that DCFS pursue an ICPC to evaluate paternal grandmother's home, and (4) that father and H.R. have monitored visits via telephone or Skype suggest the court is not ruling out that father can prove biological paternity. The court has discretion to base its determination on testimony, declarations, or statements, *or* on genetic testing. (Cal. Rules of Court, rule 5.635(e)(2), (3).) In light of the conflicting statements before the court, we cannot say the court erred in awaiting the results of genetic testing to prove biological paternity, or that it erred in finding him only an alleged father.

Father's contention that the court also erred in denying him reunification services depends entirely on his being a biological father, since the statutory scheme gives the court discretion to grant biological fathers services. (§ 361.5, subd. (a).) He does not argue that the court should have granted him reunification services as an alleged father. Our determination that the court did not err in finding him an alleged father thus defeats his contention.

## 2. *Jurisdictional Challenge*

DCFS does not address father's challenge to jurisdiction on the merits, but contends the challenge is nonjusticiable because the court sustained many other allegations of the amended petition based on mother's and Alejandro F.'s conduct. Father does not challenge jurisdiction based on the allegations against mother and Alejandro F. Therefore, DCFS argues, jurisdiction over H.R. was proper regardless of the allegations against father.

Certainly, a dependency court has jurisdiction when the actions of either parent bring the child within the statutory definition of a dependent, which fits with the purpose of a dependency proceeding to protect the child, rather than prosecute the parents. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) Accordingly, the court may base jurisdiction on the actions of one or both parents, and once established, the

9

court may enter orders binding both parents. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.) As well, "an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*Ibid.*)

DCFS's position has some merit, especially when father does not explain why we should consider what is essentially a moot issue. He does not argue that there would be legal or practical consequences from erroneously sustaining an allegation based on his conduct. He mostly reasserts the merits of his argument—that, as an alleged father, we cannot as a matter of law hold him responsible for having left H.R. "without any provision for support" under section 300, subdivision (g). He does not deny the truth of the sustained allegation. His position amounts to the following statement in his reply brief: "Father contends that if this Court does not find the juvenile court erred in denying him biological status, then he should not be part of the dependency case at all." To dispel any notion that he might be prejudiced by an erroneous order in the future, we briefly address the merits of his position.

It is true that an alleged father has limited rights in a dependency proceeding, and as some courts have put it, he does not "have a current interest in a child" (*In re O. S.* (2002) 102 Cal.App.4th 1402, 1406) that entitles him to reunifications services or custody upon removal from the custodial parent. But it makes little sense to jump from there to the conclusion that an alleged father's actions cannot be the basis for jurisdiction under section 300, subdivision (g), and father cites no authority so holding. An alleged father, by definition, means the possibility exists that the man is the biological father of the child. He has simply not shown that is the case to the degree of proof required for a judgment of biological paternity. If a party has shown conclusively that a man is not a biological father and does not qualify as a presumed father, the man will not have even the limited rights alleged fathers have in dependency proceedings. But otherwise there is always the possibility that the alleged father will elevate his fatherhood status.

10

Here, if father wanted to completely absent himself from the case and be without any responsibility for H.R., he could have checked the box on form JV-505 stating that he is not the parent of H.R. and did "not wish to participate in juvenile court proceedings about this child." He did not, nor did he indicate this wish in some other manner. He wants the chance to prove his biological paternity and wants to receive notice of the proceedings and be involved. Under the facts of this case, we cannot say the court erred in holding him responsible for H.R. and sustaining the allegations of failure to provide support.

## DISPOSITION

The orders are affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

11

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| In re H.R., a Person Coming Under the Juvenile Court Law. | B263868 (Los Angeles County Super. Ct. No. DK08465) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>E.C.,<br><br>        Defendant and Appellant. | ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:[*]

        The opinion in the above-entitled matter filed on February 25, 2016, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

[*]        BIGELOW, P. J.                FLIER, J.                GRIMES, J.