Filed 7/21/16  R.M. v. Superior Court CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| R.M.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF MENDOCINO COUNTY,<br><br>    Respondent;<br><br>MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | A148247<br><br>(Mendocino County Super. Ct.<br>No. SCUK-JVSQ-15-1724401-001) |

R.M. (Father) is the biological father of Ashley, who is a dependent of the juvenile court.  Father filed a petition seeking review, by extraordinary writ, of an order terminating reunification services and setting a Welfare and Institutions Code section 366.26 hearing.[1]  Father challenges the juvenile court's findings that he was offered reasonable reunification services and that Ashley belonged to a sibling group within the meaning of section 361.5, subdivision (a)(1)(C).[2]  Father also requests a stay

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Section 361.5, subdivision (a)(1) provides:  "Family reunification services, when provided, shall be provided as follows: [¶] (A) *Except as otherwise provided in subparagraph (C),* for a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was three years of age or older, court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in Section 361.49, unless the child

1

of the section 366.26 hearing, scheduled for August 11, 2016.  We deny the petition and the request for a stay.

### I.  FACTUAL AND PROCEDURAL BACKGROUND

*Dependency Petition*

On June 25, 2015, when Ashley was four years old, the Mendocino County Health and Human Services Agency (Agency) filed a dependency petition on behalf of Ashley and her three half siblings,[3] pursuant to section 300, subdivisions (b) and (g).  The petition alleged that the children were at substantial risk of harm due to Mother's chronic substance abuse and her inability to protect them from gang violence.  With respect to Ashley, it was further alleged Father failed to protect her from Mother's conduct and, in failing to do so, "placed his child at serious risk of harm."  In an attempt to avoid conflict with Mother, Father had not seen Ashley since she was one year old, despite having been informed of Mother's neglect.

*Detention Report and Hearing*

The detention report indicated that, in June 2015, an unrelated 11-year-old had been fatally shot at the home where Mother lived with her children.  Although Mother

---

is returned to the home of the parent or guardian. [¶] (B) For a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age, court-ordered services shall be provided for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care as provided in Section 361.49 unless the child is returned to the home of the parent or guardian. [¶] (C) For the purpose of placing and maintaining a sibling group together in a permanent home should reunification efforts fail, *for a child in a sibling group whose members were removed from parental custody at the same time, and in which one member of the sibling group was under three years of age on the date of initial removal from the physical custody of his or her parent or guardian, court-ordered services for some or all of the sibling group may be limited as set forth in subparagraph* (B).  For the purposes of this paragraph, 'a sibling group' shall mean two or more children who are related to each other as full or half siblings."  (Italics added.)

[3] Ashley's mother (Mother) has three daughters and one son, each of whom has a different father.  The petition on review here involves only Ashley (born in 2010) and Father.  Mother and the alleged fathers of her other two daughters (born in 2007 and 2012) and her son (born in 2009) are not parties to the case before us.

and her children were not at the home at the time of the shooting, they had returned shortly thereafter despite "elevated danger" evidenced by gang-related vandalism to the home. When a social worker contacted Mother to make a safety plan, Mother appeared under the influence of a controlled substance that impaired her ability to provide adequate care and supervision for her children. Mother tested positive for methamphetamine.

Father was present at the detention hearing, asserted he was Ashley's biological father, and was appointed counsel. Mother stated she did not want Father to visit Ashley because Ashley had no relationship with him and considered another half sibling's father to be her father. The juvenile court found that Father had failed to meet his burden of establishing he was Ashley's presumed father under Family Code section 7611, subdivision (d), as he had never lived with Ashley or married Mother. However, on the basis of a prior stipulated judgment for child support, Father was found to be Ashley's "adjudicated or legal father."[4] All four children were detained in foster care.

*Jurisdiction Report and Hearing*

The jurisdiction report, filed July 21, 2015, indicated the older two children had been placed in one foster home in Fort Bragg, and Ashley and her two-year-old half sister had been placed in a different Fort Bragg foster home. The social worker described an interview with Father, wherein he stated he "had no contact with his daughter Ashley since she was a year [old] because he felt 'betrayed' by [Mother] and . . . did not want conflict with [Mother]. [R.M.] also stated during the interview that through the years he

---

[4] "In California, the 'statutes governing dependency proceedings differentiate the rights of presumed, natural, and alleged fathers. [Citation.]' . . . 'Presumed father status ranks highest.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 197.) "A man who may be the father of a child but has not established his biological paternity, or achieved presumed father status, is an alleged father. [Citation] A biological or natural father has established his paternity, but has not established that he is a presumed father according to Family Code section 7611." (*In re H.R.* (2016) 245 Cal.App.4th 1277, 1283, fn. omitted.) Only a presumed father has a right to reunification services and to custody of a dependent child. (§ 361.5, subd. (a); *Mary G.*, at p. 197; *In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 [man "established to be the biological father is a 'natural father' "].) Father was never declared Ashley's presumed father.

3

has not seen Ashley, multiple people that know and have seen [Mother] have told him that Ashley was being neglected by [her] and was not attending to Ashley's needs. . . . [E]ven though he had this knowledge of his daughter possibly being neglected, he did not try to visit or confront [Mother] about these issues because he did not want to 'stir up problems' with [Mother]." Father had consistently paid child support and believed the dependency case "would be a good opportunity for him to begin visiting with his daughter and getting to know her without [Mother] becoming involved and interfering." The social worker noted Father tested positive for alcohol earlier in July.

Father was present at the jurisdiction hearing, signed a waiver of rights, and submitted on the report. The juvenile court found the allegation against Father to be true, observing "[Father] had knowledge through others of possible abuse or neglect of his daughter and yet did not take steps to protect Ashley."

*Disposition Report and Hearing*

In the disposition report, filed on August 18, 2015, the Agency noted that Ashley and her two half sisters had been placed together in the same foster home in Fort Bragg. However, their half brother had been transitioned, due to behavioral concerns, to Children's Village in Santa Rosa.

Regarding Ashley, the social worker wrote: "Ashley was fearful and untrusting when she first arrived to her foster home and she tried to block her bedroom door with a chair. She was particularly wary of the shelter care father. It was reported that she was not attentive to adult direction and was withdrawn emotionally. Also that she was noted to play recklessly, and on one occasion scraped her face going headfirst down the yard slide. Ashley is guarded and anxious around quick movements by adults, loud conversations, and what she interprets as accusations around her behavior. She seems unfamiliar with affectionate gestures, but she is quite needy for them. Though she became more communicative and basically more trusting, she was never much open to affection and does now not stiffen when she is hugged as she did early on. Ashley has a tendency to 'freeze' and be unresponsive if given a direction that she feels might be critical. Ashley is sensitive to quick movements by adults and when conversations get

4

loud. If an adult moves quickly around her, she puts her hands over her head protectively and when things get really noisy, she covers her ears. Ashley is also overeating. Initially she was allowed to have the third serving of food portions she requested. She asks for food all day, and settles for fruit and healthy snacks. Ashley tends to stuff her mouth during meal times and it seems clear that getting adequate food is an issue for her."

Mother was not communicating with the social worker, had not yet submitted to random drug testing or assessment for substance abuse treatment, and had not pursued housing assistance or the help of a "parent partner."

Father requested services and custody of Ashley. The social worker, however, observed that Father's "introduction" to Ashley was "still in its early stages." The report also mentioned Father had three other children, who he supported and saw regularly. None of Father's children live with him. Father owned and operated his own disc jockey business and refereed soccer games. He stated that Ashley would be a happy addition to his family. Father reported he "does not use drugs himself and never has," because he had seen the effects drugs had on his own father. Father's most recent drug test had been negative for alcohol and controlled substances.

Father arrived on time for visits and attempted to interact appropriately with Ashley: "Ashley is a little shy in the beginning while she visits with [Father], and mostly observes and stays quiet. Once she warms up she will ask [Father] for help building and will mostly parallel play with him." Father sometimes brought his other children, Ashley's paternal half siblings, with him to visits. The social worker recommended Father be provided family reunification services, including random drug/alcohol testing, parenting classes, and an "intake support group."

At the disposition hearing, the juvenile court found all four children to be dependent children and ordered them removed from parental custody. The court found Father had made no progress towards alleviating or mitigating the causes necessitating placement and that return of Ashley to his custody would be detrimental. Family

reunification services were ordered for both Mother and Father.[5] The juvenile court also ordered a minimum of weekly visitation for Father.

Two weeks later, the Agency submitted a case plan, which required Father to: (1) stay sober and show his ability to live free from alcohol dependency; (2) maintain a relationship with Ashley by following the visitation plan; (3) consistently, appropriately, and adequately parent Ashley; (4) stay free from illegal drugs and show his ability to live free from drug dependency; and (5) comply with all required drug tests. The case plan further provided: "With the Court ordered case plan as the guide, the social worker will work with the parent to make necessary referrals to appropriate community service providers and the family resource center's parenting classes and empowerment program."

*Six-Month Review Report*

On January 20, 2016, the Agency filed its six-month review report, which indicated the three half sisters continued to be placed together in a foster home in Fort Bragg. Their half brother had transitioned to Greenacre Homes, Inc., in Sebastopol.

Father had demonstrated little interest in completing his reunification plan. He had missed appointments with social workers, visits with Ashley, and several random drug tests.[6] Due to the number of missed drug tests, Father had been referred to a substance abuse treatment program. Additionally, Father had not attended the required support group. The social worker wrote: "Admittedly, it has been hard for him to connect with Ashley, due to her reluctance to interact with him or be alone with him. However, consistency in attending visits and showing interest in [Ashley's] well-being would have gone a long ways toward breaking down the barriers. In addition, Family Empowerment Group . . . and parenting classes could have supported [Father] in his endeavor to get to know his daughter, had he chosen to engage in those services."

---

[5] A biological father, such as Father, may be afforded services at the juvenile court's discretion if "the services will benefit the child." (§ 361.5, subd. (a) ["the juvenile court may order services for the child and the biological father"]; *In re H.R., supra*, 245 Cal.App.4th at p. 1283.)

[6] Of two tests Father took after disposition, one in November 2015 was positive for alcohol.

6

In summary, the report indicated Father had poor quality visits with Ashley, Ashley was afraid of him, he had missed numerous visits, and he refused to take advantage of services "that might help him in making a connection with his daughter." The Agency recommended termination of the services offered to both Mother and Father. Additionally, the Agency recommended discontinuation of visits between Father and Ashley.

On February 3, 2016, the social worker filed an addendum report, which updated the court on Mother's and Father's failure to "consistently and appropriately visit" and their continued failure to engage in services. Father had not visited Ashley since December 23, 2015.

On March 22 and April 12, 2016, the Agency filed two additional addendum reports. The first indicating Father had only visited Ashley once since the last court date, had declined to report for another drug test, and had not attended the required support group. The April 12 report identified certain miscommunications between the social worker and Father: "[Father's] visits are regularly scheduled to be in Fort Bragg from 11:00 a.m. to 12:00 p.m. on Thursdays. . . . [O]n March 3, 2016, there was apparently a breakdown in communication. [The social worker] was required to transport another child to court in Ukiah . . . that day. [The social worker] had arranged for another social worker assistant in the Fort Bragg . . . office . . . to supervise the visit when [Father] arrived for the visit. [The social worker] had texted [Father] to say she was in Ukiah . . . and asked if he could make the visit later from 1:00 to 2:00, when she would be back from Ukiah . . . . She failed to communicate that she had arranged for someone else to supervise the visit at 11:00 a.m., the regular visit time if he chose to visit then. [Father] responded with a text that he could not make the later visit time and that he would just do a two hour visit the following week. However, [the social worker] did not get [Father's] message on her cell phone; instead, she received a message from Verizon that said: 'Failure to retrieve security code.' [Father] did not go into the Fort Bragg . . . office, so he did not realize that another person could have supervised the visit for him that day, and [the social worker] thought that [Father] had simply failed to respond to her message.

7

[¶] . . . [¶] On March 14, 2016, [the social worker] sent [Father] a text that she had a mandatory training in Ukiah . . . that week and the next week on both Thursdays. She offered to reschedule [Father's] visits for Tuesday instead. [Father] texted back that he could not visit on Tuesdays. [The social worker] then offered to do his visit from 7:00 to 8:00 p.m. on his regular visit days, after she had traveled back to Fort Bragg . . . ." Father did not respond and did not visit on the offered Tuesdays. He visited only on the Thursdays the social worker was available—March 31 and April 7, 2016. The social worker acknowledged such miscommunications but continued to recommend termination of services because Father had failed to engage in his court ordered services.

*Six-Month Review Hearing*

At the six-month review hearing, on April 14, 2016,[7] Father's counsel made an offer of proof that the social worker would testify the last two visits between Father and Ashley had gone very well and they were "starting to have some kind of connection." County counsel made an offer of proof regarding the social worker's anticipated testimony that Father failed to drug test on March 23 and April 5, 2016. Father's counsel argued his services should not be limited to six months because Ashley was over the age of three at removal and the services offered were not reasonable. County counsel argued that Ashley's age was not determinative as there was a strong sibling bond between the three girls and the youngest had been under the age of three at removal. Counsel for the children agreed.

Ultimately, the court found by clear and convincing evidence that Ashley was part of a "young sibling group," the Agency had provided reasonable services, the parents had not made substantive progress on their case plans, and there was no substantial probability that the children would be returned to parental custody within six months. The juvenile court terminated reunification services to Father and Mother, and set a section 366.26 hearing for August 11, 2016. This writ proceeding followed.

---

[7] The six-month review hearing was continued on several occasions.

8

## II. DISCUSSION

In his writ petition, Father argues the juvenile court erred by classifying Ashley as a member of a sibling group, within the meaning of section 361.5, subdivision (a)(1)(C), so that his reunification period was subject to the more restrictive time limits applicable to Ashley's younger sister. Father also maintains substantial evidence does not support the juvenile court's finding the Agency offered reasonable reunification services. Father's arguments are not persuasive.

### A. *Sibling Group*

The age of a child at removal generally dictates the duration of reunification services. (§ 361.5, subd. (a)(1); but see *In re Derrick S.* (2007) 156 Cal.App.4th 436, 439 ["[n]o statute or rule of court restricts a juvenile court's discretion to order less than the maximum amount of reunification services when confronted with a parent who is unwilling or unable to benefit from additional reunification services, or if for other reasons the likelihood of reunifying the family is faint"].) As a general rule, parents are granted 12 months of services if the child is three years of age or older and six months of services if the child is under the age of three. (§ 361.5, subd. (a)(1)(A)–(B).) "In the interest of expediting permanency and improving the chances of adoption for very young children, the Legislature has limited the reunification period to six months for children who are under three on the date of the initial removal. In the case of a sibling group which includes children in both categories, at the six-month hearing the court may split up the siblings by expediting permanency for the younger sibling, expedite permanency for the entire sibling group (thus reducing the older siblings' minimum reunification period to six months), or continue the case to the 12-month hearing for all of the children (thus increasing the reunification period for the younger sibling). The clear purpose of these provisions is to give the court flexibility to maintain a sibling group together in a permanent home." (*Abraham L. v. Superior Court* (2003) 112 Cal.App.4th 9, 13–14, fns. omitted; accord, § 366.21, subd. (e)(3).)

"In furtherance of the societal interest in placing and maintaining a sibling group together in a permanent home, the Legislature has imposed strict requirements before the

court may make a determination at the six-month hearing to schedule a section 366.26 hearing for some or all of the sibling group members. Section 366.21, subdivision (e), paragraph four, provides that in making its determination the court must review and consider the Agency's report. Factors the report must address, and the court must consider, include the following: (a) whether the children were removed from parental care as a group; (b) the closeness and strength of the sibling bond; (c) the siblings' ages; (d) the appropriateness of maintaining the group together; (e) the detriment to each child if sibling ties are not maintained; (f) the likelihood of finding a permanent home for the group; (g) whether the group is currently placed together in a preadoptive home or has a concurrent plan goal of legal permanency in the home; (h) the wishes of each child whose age and condition permits a meaningful response; and (i) the best interest of each child in the group. Additionally, the court must specify the factual basis for its finding that it is in each child's best interest to schedule a section 366.26 hearing for some or all of the members of the sibling group." (*Abraham L. v. Superior Court, supra*, 112 Cal.App.4th at p. 14, italics omitted.)

Here, the juvenile court considered the Agency's addendum report, in which the social worker noted: (1) all four very young children were removed from Mother's care at the same time; (2) the children, who are close in age, exhibited a "clear, strong bond and closeness" with one another;[8] (3) living as a sibling group together, or living close to one another for frequent visitation would be emotionally beneficial and appropriate for the children; (4) before detention, the three older children "depended on one another for [emotional] comfort and support," and the girls were especially anxious when separated; (5) the girls' current foster home was willing to assume permanent guardianship of them; (6) the three older children wanted to be together with the youngest child; (7) it would be in the best interest of each child to remain together in permanent placement.

---

[8] For example, the three girls continued to be afraid to sleep apart from one another, and they remembered their half brother "nightly in their prayers."

Father maintains the juvenile court necessarily erred because substantial evidence does not show all four children would be placed together in a permanent home. Father's position is that Ashley should not be treated as part of a sibling group because her half brother has not been placed with her or the other two children since August 2015. While the children's future cannot be known at this stage of the dependency proceedings, the Agency's report demonstrates an intention is to keep the half siblings together and to seek a prospective adoptive family for all four them.

Furthermore, at the time of the six-month review hearing, Ashley's foster parents were willing to provide a permanent home to *all three half sisters*. Ashley is in a potentially permanent home with "a sibling group" comprised of her and two of her half siblings, with whom she clearly has strong bonds. (See § 361.5, subd. (a)(1)(C) [" 'a sibling group' shall mean two or more children who are related to each other as full or half siblings"].) We see no reason to risk these bonds based on the fact Ashley's half brother has been placed elsewhere. Father has no standing to complain about the effect of expedited permanency on a child other than Ashley. Substantial evidence supports the juvenile court's finding that Ashley is a member of a sibling group the court should attempt to keep together.

B.     *Reasonable Reunification Services*

Father also challenges the juvenile court's finding he was offered reasonable reunification services. Section 366.21, subdivision (g)(4), "makes the provision of reasonable services to the parent an absolute condition for the termination of parental rights." (*In re Monica C.* (1995) 31 Cal.App.4th 296, 304.) In order to set a section 366.26 hearing, the Agency bore the burden of proving by clear and convincing evidence that reasonable reunification services have been provided or offered to the parents. (§ 366.21, subd. (g)(4).) We review a reasonable services finding for substantial evidence (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762), bearing in mind the heightened burden of proof (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971). Under the clear and convincing evidence burden of proof, " 'evidence must be so clear as to

leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Monica C.*, at p. 306.)

"In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) In determining whether services were reasonable, the juvenile court considers not only the appropriateness of the services offered but also the extent to which the agency facilitated utilization of the services and the extent to which the offending parent availed him or herself of the services provided. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Misako R.*, at p. 547.)

"Section 361.5 has been construed, however, to require '[a] good faith effort' to provide reasonable services responding to the unique needs of each family." (*In re Monica C., supra*, 31 Cal.App.4th at p. 306.) "The basis of reunification is protecting dependent children by identifying and ameliorating the factors that placed them at risk in the home." (*In re Terry H.* (1994) 27 Cal.App.4th 1847, 1854, superseded by statute on other grounds as stated in *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 54.) "It is the job of a [social services agency] to assist parents with inadequate parenting skills in remedying the sources of the problem, not to eradicate the problem itself. . . . [¶] . . . A proper service plan must be tailored to the specific needs of the dysfunctional family. However, to make the requisite findings, the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M., supra,* 235 Cal.App.3d at p. 414.)

12

Here, the Agency identified Father's lack of a protective relationship with Ashley at the outset, as well as potential substance abuse issues, and attempted to provide resources to address these matters. Father was initially referred for random drug testing in July 2015, shortly after Ashley's detention. Thus, by the time of the six-month review hearing in April 2016, Father had been offered services for approximately nine months. But during that time period, Father had tested positive for alcohol twice and often failed to test. The Agency responded by referring him to a substance abuse treatment program, which he also declined to pursue. Father's resistance to testing was inconsistent with his assertion he has no substance abuse problem.[9]

Similarly, Father attended only some of his scheduled visits with Ashley and, over the course of almost nine months, made no effort to attend a recommended support group or parenting classes. Agency efforts to facilitate services for Father is well documented in the record. During that nine-month period, social workers provided gas vouchers to assist with transportation to visits, sent Father numerous letters reminding him of the case plan's requirements, repeatedly asked him to contact the Agency, and provided alternate times for visits when scheduling conflicts arose.

Father complains the Agency did not provide therapeutic visits to help him and Ashley connect. But the Agency provided services aimed at the absence of a relationship—parenting classes and visitation. Father's resistance to visiting regularly limited the Agency's ability to provide him with additional services that might have assisted such visitation. It was not unreasonable for the Agency to refrain from providing therapeutic visitation when Father did not consistently show up for visits.

"Where the minor is reluctant to visit, and family therapy is needed to promote visitation, such therapy may be critical to reunification." (*In re Alvin R., supra,*

---

[9] At disposition, Father raised no objection to the case plan that required drug testing. As a result of this failure to object or appeal from the dispositional order, Father forfeited his argument that the drug testing requirement was unreasonable. (*In re T.G.* (2015) 242 Cal.App.4th 976, 984–985; *In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* 2008) 167 Cal.App.4th 953, 962.)

108 Cal.App.4th at p. 972; *id.* at pp. 972–973 [agency did not provide reasonable services to enable joint therapy, which was critical for visitation, when father "had done all that was required of him under the plan" and agency's "only effort to overcome" scheduling difficulties was to make referral to therapist who did not have available time].) But here, unlike in *Alvin R.,* it was not Ashley's reluctance to visit Father or the social worker's other obligations that were the obstacle to visitation—it was Father's apparent reluctance to make Ashley a priority and visit consistently. While the social worker's competing obligations to other dependent children may have interfered with Father's visitation on at least one occasion, the responsibility for Father's failure to consistently visit and engage in services lies squarely on Father.

The record demonstrates that the Agency identified the problems leading to removal, offered services designed to remedy those problems, maintained reasonable contact with Father during the course of the plan, and made reasonable efforts to assist Father in areas where compliance proved difficult. (See *In Riva M., supra,* 235 Cal.App.3d at p. 414.) Substantial evidence supports the juvenile court's finding reasonable reunification services had been offered.

### III.    DISPOSITION

The writ petition is denied on the merits. The request for a stay is also denied. Because the section 366.26 hearing is set for August 11, 2016, our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

14

_____

Bruiniers, J.

We concur:


_____

Simons, Acting P.J.


_____

Needham, J.

15

A148247