Filed 2/14/22  In re Kyla G. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re KYLA G., a Person Coming Under the Juvenile Court Law. | B308835 |
| | (Los Angeles County Super. Ct. No. 20LJJP00190B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| DONALD A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael C. Kelley, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————————————

Donald A. appeals the juvenile court's finding he was not the biological father of now-15-year-old Kyla G., contending it was not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dependency Petition and Detention Hearing*

On March 24, 2020 the Los Angeles County Department of Children and Family Services (Department) filed a petition pursuant to Welfare & Institutions Code section 300, subdivisions (a), (b), (i) and (j),[1] on behalf of Kyla and her siblings, K.G. (now 17 years old), Anthony G. (now 12 years old), Harmony G. (now 11 years old) and Roland A. (now five years old). The petition identified Samuel G.[2] as the presumed father of the four older children and Roland A., Sr., as the alleged father of the youngest. In the 23-count petition the Department alleged the children's aunt and legal guardian, Lashonda W., had physically abused the children, was an abuser of drugs and alcohol and had allowed her male companion to live in the home despite being an abuser of drugs and alcohol. In addition, one

---

[1]    Statutory references are to this code unless otherwise stated.

[2]    The record reflects Samuel also goes by the name Anthony. For clarity, we refer to him as Samuel.

count of the petition alleged Samuel had a mental disability that limited his ability to provide appropriate care and supervision of the four older children.

The detention report included information regarding a 2015 dependency proceeding in which the Department had filed a petition pursuant to section 300, subdivision (b), alleging the children's mother, Jenetta W., had failed to protect K.G., Kyla, Anthony and Harmony (Roland had not yet been born) from domestic violence between Jenetta and her boyfriend, Roland, Sr., and from Roland, Sr.'s drug abuse. The juvenile court sustained the petition, found Samuel to be the presumed father of the children and ultimately terminated jurisdiction, awarding joint legal custody of the children to Samuel and Jenetta with sole physical custody to Samuel.

In 2018 Jenetta and Roland, Sr., were killed in a car accident. In April 2019 Jenetta's sister, Lashonda, was appointed legal guardian for all five children. According to the detention report Samuel suffers from an unspecified mental disability caused by a childhood injury, which appears to have been, at least in part, the basis for Lashonda's appointment as the children's legal guardian.

At the detention hearing on March 27, 2020 the court found a prima facie case for removing the children from Lashonda and ordered them placed in foster care. Samuel's counsel informed the juvenile court of the prior case and the finding that Samuel was the presumed father of the four older children. The court stated that finding would remain in place. Kyla's counsel advised the court, "Kyla is particularly distraught about the current situation and her mother having passed . . . . She is requesting that the Department make all efforts they can to arrange

whatever kind of visitation they can for [Samuel]." The court ordered monitored visitation between Samuel and Kyla, with the Department having discretion to liberalize visits.

2. *Donald's Parentage Claim and the Court's Parentage Determination*

In a July 17, 2020 jurisdiction/disposition report the Department informed the court it had been contacted on May 26, 2020 by Donald, who claimed he was Kyla's biological father. Donald explained Jenetta had told him he was Kyla's father and they had discussed introducing Kyla to him. Donald said he was not involved in Kyla's life because Roland, Sr., had not allowed it. Donald expressed his desire to obtain custody of Kyla. The Department recommended the court order a paternity test.

On August 3, 2020 Donald's counsel filed a Judicial Council form JV-505 statement regarding parentage.[3] The form indicated Donald did not know whether Kyla was his daughter and requested a DNA test. The form did not contain any additional information regarding Donald's relationship to Jenetta or Kyla. At a hearing on the same date the court ordered DNA testing for Kyla and Donald and granted Donald monitored visitation with Kyla for two hours once per week.

In a last minute information filed September 2, 2020 the Department stated neither Donald nor Kyla had appeared for the scheduled genetic testing. Kyla told a Department social worker she did not want to know whether Donald was her biological father and would not submit to the test. In addition, Kyla's foster

---

[3] The form was signed by Donald's counsel but not by Donald.

parent was concerned the genetic testing could be detrimental to Kyla's emotional well-being. The Department reported, "The information that [Donald] may be the minor's father came as a shock to the child and the child is having a difficult time processing the information." At a hearing on September 17, 2020 Kyla's counsel reiterated Kyla's opposition to genetic testing and counsel expressed her own concern for Kyla's mental health. The court ordered the parties to brief the issue of compelling DNA testing.

On September 30, 2020 Kyla filed a section 388 petition requesting the juvenile court modify its August 3, 2020 order for DNA testing. The petition explained Kyla had refused to participate in the genetic testing and had refused to attend visits with Donald because she had never met Donald and had no relationship with him.

Also on September 30, 2020 Donald moved to compel DNA testing as previously ordered. In an accompanying declaration Donald stated he had been incarcerated at the time of Kyla's birth but had called Jenetta frequently to inquire about Kyla and sent Jenetta letters and photographs for Kyla. When he was released in 2013, he met with Jenetta; and she said she would bring Kyla to meet him, but never did. Jenetta asked Donald not to visit Kyla because it would upset Roland, Sr. Donald was incarcerated again in 2015, but he continued to call and write to Jenetta. Donald was released in 2019 and learned Jenetta had passed away. He tried to locate Kyla at two prior addresses but did not find her. In May 2020 Donald learned from Jenetta's cousin that Kyla was in foster care. Donald stated he wanted to build a relationship with Kyla and wanted a DNA test to confirm paternity. Donald had missed his two scheduled DNA test dates

due to transportation issues. Kyla and the Department filed oppositions to Donald's motion.

In a last minute information filed October 7, 2020 the Department reported Samuel, his mother and his sister were all shocked at Donald's paternity claims. Samuel believed Kyla was his biological daughter. Samuel's mother, Mary M., told the Department social worker that Samuel and Jenetta were living with her when Jenetta became pregnant with Kyla and she had never heard of Donald before this case.

At a hearing on October 7, 2020 the court stated it believed paternity could be resolved without genetic testing but deferred ruling on the motion to compel. The court set the matter for a paternity hearing.

In advance of the hearing Kyla submitted a declaration stating her mother never told her anyone other than Samuel was her father. She said Samuel "has taken care of me all of my life, for as long as I can remember, and has always treated me as his daughter." Kyla had never met or heard of Donald until his appearance in this case, and she did not wish to have any relationship with him.

Samuel filed a declaration stating he had "lived with [Jenetta] during the conception of Kyla." He believed Kyla is his biological daughter, and he had never previously heard of Donald. Mary also filed a declaration stating Jenetta had lived with her when she became pregnant with Kyla and she had no reason to believe Samuel was not Kyla's biological father. Samuel's sister filed a declaration stating she had never heard of Donald until this case and had no reason to believe Samuel was not Kyla's biological father.

6

Donald filed another declaration on October 19, 2020, stating he began having a sexual relationship with Jenetta in 2005. During that time Jenetta regularly stayed overnight at his house, and they often had unprotected sex. Donald claimed Kyla resembled him and his other daughters. Jenetta had repeatedly told him Kyla was his daughter. Donald recounted an incident in 2006 when Samuel approached Donald at a restaurant and said Samuel was Kyla's father. Donald believed Samuel made that comment because he knew Donald had a sexual relationship with Jenetta.

On October 21, 2020 Donald filed a signed statement containing testimony he would give if he testified at the paternity hearing. The statements concerned Jenetta's social media activity in 2015 and 2016. Donald stated that in August 2015 Jenetta posted a picture of Donald with a caption that referred to Donald as her "boo" (a slang term of affection, often a boyfriend or girlfriend) and said she was thinking about him. In November 2015 another woman with whom Donald has a child posted a photograph of herself with Donald. Jenetta commented, "girl u just have him for the moment so just enjoy him while u can." When the other woman asked who Jenetta was, Jenetta replied she was the mother of Donald's child. In October 2016, when Donald was incarcerated, the other woman sent Jenetta a message asking for pictures of Kyla to give to Donald. Jenetta responded the same day with photographs of Kyla. Donald submitted screen shots of these messages with his statement.

The paternity hearing was held on October 22, 2020. At the outset counsel for the Department, Samuel and Kyla objected to Donald's proffered testimony and social media screen shots on hearsay, foundation and authentication grounds. The juvenile

7

court stated it would admit the testimony and exhibits but "give them appropriate weight and apply[] applicable law, including hearsay." The parties did not present any live testimony but proceeded to argument based on the submitted declarations and evidence.

After hearing argument the court denied the motion to compel genetic testing and found Samuel to be Kyla's biological father. The court specifically relied on the parentage questionnaire submitted by Jenetta in the 2015 dependency proceeding in which Jenetta had identified Samuel as Kyla's father.[4] In addition, the court pointed out, in that questionnaire Jenetta had identified Samuel as Harmony's father but indicated another individual was her biological father. Jenetta did not identify a biological father for Kyla. The court stated, "This tells me that if in fact [Donald] was the bio father of [Kyla] that mother in her parentage questionnaire would have made the same distinction that she made in the case of the minor Harmony. This to me is strong evidence that mother did not believe anyone other than [Samuel] was the biological father to Kyla." The court further found the social media statements, even if considered under a hearsay exception, lacked indicia of reliability and were made in an untrustworthy context,

---

[4] The record on appeal does not contain the parentage questionnaire submitted in the 2015 proceeding. Although we granted Donald's motion to augment the record with the questionnaire, the clerk of the superior court was unable to locate the 2015 case file. Regardless, Donald has not disputed, either in the juvenile court or on appeal, the juvenile court's characterization of the statements in the 2015 parentage questionnaire.

particularly when compared with the statements in the 2015 parentage questionnaire that were made under oath.

The court found Donald was an alleged father only and relieved his counsel.  Donald filed a notice of appeal on November 10, 2020.

3. *The First Amended Petition, the Jurisdiction and Disposition Hearings and Termination of Jurisdiction*[5]

The Department filed a first amended section 300 petition on October 5, 2020.  At the jurisdiction hearing on November 18, 2020 the juvenile court dismissed one count of the amended petition and sustained the remaining counts as interlineated. The disposition hearing was held on February 17, 2021.  The court removed Kyla from Samuel and Lashonda and ordered family reunification services for Samuel.

On June 18, 2021 Kyla was returned to Samuel's custody, and on December 20, 2021, Kyla was released to Samuel and jurisdiction was terminated.

**DISCUSSION**

1. *The Parentage Findings Are Reviewable*

As Donald recognizes in his opening brief, generally the first appealable order in the dependency process is the disposition order.  (*In re A.O.* (2015) 242 Cal.App.4th 145, 148; *In re T.W.* (2011) 197 Cal.App.4th 723, 729; see *Contra Costa County Children & Family Services Bureau v. Superior Court* (2004) 117 Cal.App.4th 111, 116 ["findings and orders made prior to the

---

[5]     We take judicial notice of the juvenile court's minute orders dated November 18, 2020, February 17, 2021, June 18, 2021 and December 20, 2021.  (Evid. Code, §§ 459, 452, subd. (d).)

9

dispositional hearing, including those made at the jurisdictional hearing, may be reviewed on appeal from the dispositional order, which is the first appealable judgment in a dependency proceeding"].) Although Donald's appeal may, therefore, have been premature because filed three months prior to the court's disposition orders, Donald urges us to exercise our discretion pursuant to California Rules of Court, rule 8.406(d) to deem the notice of appeal as filed immediately after the entry of the disposition orders. We agree it is appropriate to exercise that discretion here. (See *In re M.Z.* (2016) 5 Cal.App.5th 53, 62 ["[a]ssuming, without deciding, an order regarding presumed parent status is not directly appealable, we exercise our discretion and treat the notice of appeal as timely from the subsequent disposition order"].)

A second justiciability issue arises from the fact dependency jurisdiction has been terminated since Donald filed his notice of appeal. "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.'" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) Reviewing courts have exercised their discretion to consider an appeal of jurisdiction findings despite the subsequent termination of jurisdiction when the jurisdiction findings "could be prejudicial to the appellant or could impact the current or any future dependency proceedings" or "the finding[s] could have consequences for the appellant beyond jurisdiction." (*In re J.C.* (2014) 233 Cal.App.4th 1, 4; accord, *In re C.C.*, at p. 1488 ["'[a]n issue is not moot if the purported error infects the outcome of subsequent proceedings'"];

cf. *In re I.A.* (2011) 201 Cal.App.4th 1484, 1493 [appellate court will not exercise discretion to hear a moot appeal unless "specific legal or practical consequence[s]" from the challenged finding can be identified].)

Neither party has discussed whether termination of jurisdiction affects this appeal. However, because the paternity determination has an obvious direct and lasting impact on Donald's legal relationship to Kyla, we exercise our discretion to address the appeal on the merits. (See *In re P.A.* (2011) 198 Cal.App.4th 974, 979 [termination of dependency jurisdiction did not render moot appeal regarding paternity determination because alleged father's "rights were adversely affected by the court's judgment of paternity . . . , which may have consequences for [alleged father] in the future"]; cf. *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548 ["[b]ecause the jurisdictional issues were actually litigated in the dependency proceeding, appellant is collaterally estopped from relitigating those issues in the family law court"].)

2. *Substantial Evidence Supports the Juvenile Court's Paternity Findings*

The Uniform Parentage Act (UPA) (Fam. Code, § 7600 et seq.), which governs parentage determinations (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 116), identifies "the parent and child relationship" as "the legal relationship existing between a child and the child's natural or adoptive parents." (Fam. Code, § 7601, subd. (b); *Elisa B.*, at p. 116.) In determining who qualifies as a natural parent, the juvenile courts recognize and differentiate among three categories of parents: an alleged parent, a genetic parent (referred to in the governing statutes as the "biological" parent) (see, e.g., Welf. & Inst. Code, § 361.5) and

a presumed parent. (*In re H.R.* (2016) 245 Cal.App.4th 1277, 1283; accord, *In re D.P.* (2015) 240 Cal.App.4th 689, 695.)

An alleged parent, one whose maternity or paternity has not yet been established, or who has not achieved presumed parent status (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15; *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596), has a narrow range of rights in dependency proceedings, generally limited under the due process clause to notice of the proceedings so that he or she may appear and have the opportunity to challenge his or her parentage status. (*In re D.P., supra*, 240 Cal.App.4th at p. 695; *In re J.H.* (2011) 198 Cal.App.4th 635, 644; *In re O. S.* (2002) 102 Cal.App.4th 1402, 1408.) An alleged parent is not entitled to custody or reunification services. (*In re H.R., supra*, 245 Cal.App.4th at p. 1283; *In re D.A.* (2012) 204 Cal.App.4th 811, 824.)

A genetic parent is one whose maternity or paternity has been established, but who has not achieved presumed parent status pursuant to Family Code section 7611. (*In re Zacharia D., supra,* 6 Cal.4th at p. 449, fn. 15; *In re H.R., supra*, 245 Cal.App.4th at p. 1283; see *In re P.A., supra,* 198 Cal.App.4th 974, 980 ["[a] man's status as biological father based on genetic testing does not entitle him to the rights or status of a presumed father"].) A genetic parent may have an opportunity for reunification services only if the court determines such services will benefit the child. (Welf. & Inst. Code, § 361.5, subd. (a).)

A presumed parent "ranks highest" of all three categories and enjoys a full panoply of rights attendant to parenthood, including entitlement to appointed counsel (Welf. & Inst. Code, § 317, subd. (a)), custody (assuming the court has not made a

detriment finding) and reunification services.[6] (*In re H.R., supra*, 245 Cal.App.4th at p. 1283; *In re D.P., supra*, 240 Cal.App.4th at p. 695; see generally *In re Nicholas H.* (2002) 28 Cal.4th 56, 65 [presumed parent status is intended to preserve the important relationship created between parent and child when the alleged parent has treated that child as a son or daughter].) "A biological father can be a presumed father, but is not necessarily one; and a presumed father can be a biological father, but is not necessarily one." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.)

"If the alleged father appears in court 'and requests a judgment of parentage on form JV–505,' the court shall determine: '(1) Whether that person is the biological parent of the child; and [¶] (2) Whether that person is the presumed parent of the child, if that finding is requested.' (Cal. Rules of Court, rule 5.635(h), fn. omitted.) To determine parentage, the court may order genetic testing, or it may base the determination on testimony, declarations, or statements of the alleged parents." (*In re H.R., supra*, 245 Cal.App.4th at p. 1284; see also *In re D.P., supra*, 240 Cal.App.4th at p. 696 [determination of biological parentage may be made "either by ordering blood testing or based

---

[6] "Under Family Code section 7611, the factors bearing on presumed father status include: (1) whether the man and the child's natural mother married or attempted to marry; (2) whether the couple was cohabitating; (3) whether the child's birth certificate named the man as the father; (4) whether the man pays child support, either voluntarily or by court order; (5) whether the man receives the child into his home and openly holds out the child as his natural child; and [(6)] whether the man signed a voluntary declaration of paternity. (Fam.Code, §§ 7540, 7573, 7611, subds. (a)-(d).)" (*In re H.R., supra*, 245 Cal.App.4th at p. 1283, fn. 3.)

on testimony, declarations or statements by the mother and alleged father"]; Cal. Rules of Court, rule 5.635(e)(2), (3).)

We review a juvenile court's parentage determination for substantial evidence. (*In re M.Z., supra,* 5 Cal.App.5th at p. 64; *In re H.R., supra,* 245 Cal.App.4th at p. 1284.) "We view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] We defer to the trial court's credibility resolutions and do not reweigh the evidence. [Citation.] If there is substantial evidence to support the ruling, it will not be disturbed on appeal even if the record can also support a different ruling." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780.)

Donald argues the evidence supporting Samuel's biological paternity was conclusory and speculative, particularly because Samuel's declaration did not contain "any indication that Samuel and mother were in a committed sexual relationship during the time period when Kyla was conceived." In contrast, Donald argues, he testified he had a sexual relationship with Jenetta during the relevant time period and Jenetta had told him Kyla was his daughter. While Donald is correct that Samuel's declaration did not contain much detail, it did state he had lived with Jenetta during the time Kyla was conceived, which was corroborated by Samuel's mother. That evidence, plus the uncontested fact that Samuel was the genetic father of two of Jenetta's other children (the two children closest in age to Kyla), reasonably supports the inference that Samuel and Jenetta had a sexual relationship during the time Kyla was conceived. In addition, the juvenile court found much of Donald's evidence to be unreliable, especially when weighed against the parentage

14

questionnaire submitted by Jenetta in the 2015 proceeding. Viewing the evidence in the light most favorable to the trial court's ruling and deferring to its resolution of conflicting evidence, substantial evidence supports the finding Samuel was Kyla's biological father.

## DISPOSITION

The juvenile court's paternity finding is affirmed.


                                        PERLUSS, P.J.


We concur:


        SEGAL, J.


        FEUER, J.

15