Filed 3/3/23  In re Angel D. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANGEL D., A Person Coming Under the Juvenile Court Law. | B317501 (Los Angeles County Super. Ct. No. 21CCJP04233A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>Y.C. et al.,<br><br>        Defendants and Appellants. | |

        APPEALS from findings and orders of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant Y.C.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant A.D.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendants and appellants Y.C. (mother) and A.D. (father) each appeal from the juvenile court's November 18, 2021, jurisdictional findings and dispositional orders in which their son, Angel D. (minor, born Feb. 2012), was declared a dependent of the court and removed from parental custody.  Because the findings and orders are supported by substantial evidence, we affirm.

## BACKGROUND

I. *The Family*

The family consists of mother, father, and minor.  When these dependency proceedings commenced, the parents' relationship had been over for several years.  Mother began dating Arturo V. (Arturo) in 2015.  Father began dating Ruby M. (Ruby) around 2017.

2

## II. *Referral*

On August 20, 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging general neglect of minor by mother. According to the referral, mother dropped minor off at the paternal grandfather's house on August 12, 2021, and asked him to watch minor for a few days. Father picked minor up that day and had been caring for him since. Father found videos on minor's phone in which minor had writing on his arms and was throwing gang signs, and there was a bandana and a gun on the bed.

## III. *DCFS's Initial Investigation*

In response to the referral, a DCFS social worker interviewed the family.

### A. <u>Father</u>

While waiting for father outside of his apartment complex, the social worker heard a man and a woman screaming from the direction of father's apartment. The screaming stopped when the social worker called father to announce her arrival. The screaming resumed when the call ended. When father came outside to greet the social worker, the social worker "observed fresh scratch marks" on father's neck, forearms, and forehead. Father's shirt was stretched out, and "he was panting as if he [had been] exercising or yelling."

Father stated that a 2015 family law order granted mother full custody of minor with weekend visitation for father. Mother, however, would refuse to let father see minor. Last year, mother had called father to pick up minor "because she could not handle his behavior anymore." Father showed the social worker a September 2020 notarized letter from mother stating that she was giving father full custody of minor. Father reported that,

two weeks after mother signed the letter, she picked up minor. Father did not see minor again until his birthday and then not again until the previous week.

Regarding the videos he found on minor's phone, father reported that minor appeared to be holding machine and hand guns. Minor had told father that the guns belonged to mother's boyfriend, Arturo. Minor had recently disclosed that Arturo hit him on his stomach. Minor told his mother about the abuse, but she did not believe him.

Father reported that he had an open domestic violence case from 2016 with a former partner, in which he was listed as the perpetrator. He had recently completed a 52-week domestic violence program. Father denied any domestic violence with Ruby.

B. <u>Minor</u>

Minor stated that he and mother would sometimes live with Arturo. While minor slept, Arturo would cover minor's mouth to prevent him from making noise and then punch him hard in the stomach. This would leave minor with marks and in pain for days. Minor reported this abuse to mother, but she thought he was making it up. One night, mother caught Arturo abusing minor. She brandished a knife and cut Arturo's stomach. Arturo called the police, who arrested mother.

Minor further reported that, on more than 10 occasions, Arturo would force minor to defecate and then ingest his own feces. According to minor, mother did not know about this form of abuse. Minor reported recent contact with Arturo, but he was unsure when it was. Minor stated that mother and Arturo frequently fought, and mother sometimes drove drunk with minor after such fights occurred.

4

Minor also reported domestic violence between father and Ruby. They would fight every day, multiple times per day, and the fights would become physical. Father and Ruby had been arguing earlier that day.

C. Mother

The social worker spoke with mother the day after she interviewed father and minor. Mother stated that she did not want minor seeing father because he was a "gangster[.]" She denied knowing about the videos that showed minor displaying gang signs and with firearms.

Mother said it had been "over three years" since she was last with Arturo. Mother accused father of "brainwashing [minor] with information that is not true." She denied ever stabbing Arturo. Mother was concerned about minor's physical safety because he had been witnessing physical fights between father and Ruby on a daily basis. Mother said that Ruby was "embarrassing" her on social media by calling her names and posting pictures of her. Mother stated that she would "'handle it by fighting [Ruby].'"

IV. *Detention*

On September 2, 2021, DCFS sought and obtained an order authorizing the detention of minor from mother and father. Minor was detained the next day and placed in foster care.

V. *Dependency Petition*

A few days after minor was detained, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over minor pursuant to Welfare and Institutions

5

Code section 300, subdivisions (a) (nonaccidental serious physical harm) and (b)(1) (failure to protect).[1]

Counts a-1 and b-2 alleged that mother and Arturo had a history of engaging in violent altercations in minor's presence, including an incident when mother brandished a knife and cut Arturo's stomach.

Count b-1 alleged that Arturo physically abused minor by forcing minor to defecate and then eat his own feces. Arturo had also hit minor's stomach. Mother knew that Arturo had struck minor but failed to protect him by allowing Arturo unlimited access.

Count b-3 alleged that father and Ruby had a history of engaging in violent altercations in minor's presence. Father failed to protect minor by allowing Ruby to reside in minor's home and have unlimited access to minor.

Finally, count b-4 alleged that mother placed minor in detrimental and endangering situations by allowing minor to possess rifles and handguns and driving minor while under the influence of alcohol.

VI. *Last Minute Information for the Court (Sept. 10, 2021)*

Father had spoken with minor while he was in foster care. Father was heard telling minor that he was "glad [minor] was placed in a 'Mexican household and not a Black one,' and that '[minor] should not worry or be sad because it's the system's fault.'" Father ended the conversation by saying, "'f*** the system.'" The report noted that father's statements had placed minor and other children in the home at risk, "as there are several children in the home who identify as African American."

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

6

Based on father's statements and concerns about minor running away, minor was placed in another home.

VII. *Detention Hearing*

The juvenile court held a preliminary detention hearing on September 10, 2021, where it found that father was minor's presumed father and made temporary detention findings. At the continued hearing on September 13, 2021, the court found that a prima facie showing had been made that minor was a person described by section 300 and ordered minor detained from parental custody. Mother and father were granted visitation.

VIII. *Jurisdiction/Disposition Report*

A. <u>Interviews</u>

The DCFS dependency investigator interviewed minor, mother, and father about the allegations in the dependency petition.

1. *Minor*

Minor recalled an incident when he was six or seven years old. Mother and Arturo were arguing, Arturo grabbed a knife, mother grabbed a knife, and then the police came. Minor stated that mother was no longer with Arturo.

When asked "if Arturo did anything 'bad' to him[,]" minor replied that "he always did bad things to him." When mother was asleep, Arturo "'threw him in a pool in the middle of the night'" and made him take cold showers. Arturo "'made [minor] poo' and then he 'made [minor] eat it[.]'" Minor told mother the next day; she believed him and broke up with Arturo for one day before going back to him. Minor was afraid of Arturo, which caused him to be afraid to sleep at night.

Minor reported that father and Ruby fought all the time, with Ruby hitting father. Father would restrain Ruby and tell

7

her to stop; sometimes, father closed the door on Ruby so that she could calm down.

### 2. *Mother*

Mother had left Arturo because of the way he had treated her. She denied any physical altercations and denied that she had brandished a knife at Arturo. When minor was five years old, mother confronted Arturo when she found him holding minor in a cold shower in the middle of the night as a punishment. She had been afraid to call the police due to Arturo's threats. Minor never told mother that Arturo forced him to eat feces. Mother had stayed with Arturo because she thought he would change.

### 3. *Father*

Father denied the allegations regarding domestic violence with Ruby. He also denied having verbal arguments with her. Father said that the day the social worker came to father's apartment complex, his neighbors were having a loud party.

### B. Police report

The police report of a 2016 domestic violence incident between mother and Arturo was attached to the jurisdiction/disposition report.

Mother told the police that she had informed Arturo that she no longer wanted to be with him. While mother started packing her belongings, Arturo told her that he was using his cell phone to record her. He then began to yell, "'Stop ripping my clothes!'"; "'Stop hitting me!'"; and "'Drop the knife!'" Mother responded, "'Which clothes? What knife? I'm not hitting you.'" When mother tried to grab Arturo's phone, he squeezed her hand on the phone and pushed her, causing a cut on her index finger. She stated that visible marks on her chest had been caused by Arturo pushing her.

Arturo stated that he had witnessed minor suffocating Arturo's then three-year-old son with a pillow. Arturo became very upset and told minor to get off of his son. Mother then became upset, pulled Arturo's shirt, and scratched and wounded him. Sometime later, mother picked up a knife and brandished it at Arturo. Arturo's then nine-year-old son also reported that he saw mother rip Arturo's shirt with what appeared to be a knife in her hand.

Mother and Arturo were both arrested for willful infliction of corporal injury pursuant to Penal Code section 273.5, subdivision (a).

In a subsequent interview, mother denied that she had brandished or threatened Arturo with a knife at any time. She stated that minor had been in the room with her and Arturo during the altercation. Toward the end of the argument, minor got between them and began throwing hangers at Arturo, apparently trying to defend mother.

IX. *Adjudication Hearing*

The adjudication hearing was held on November 18, 2021.

Following oral argument, the juvenile court sustained counts a-1 and b-2 regarding domestic violence between mother and Arturo,[2] count b-1 regarding Arturo's physical abuse of

---

[2]    The sustained a-1 and b-2 counts state: "The child['s] . . . mother . . . [and her] male companion, Arturo V[.], have a history of engaging in violent altercations in the child's presence. On a prior occasion the mother brandished a knife at the mother's male companion and cut the male companion's stomach, in the presence of the child. On other occasions, the mother and the male companion would engage in physical altercations. Such violent conduct on the part of the mother against mother's male companion endangers the child's physical health and safety and

9

minor,[3] and count b-3 regarding domestic violence between father and Ruby.[4]  The court dismissed count b-4.  Minor was declared a

---

places the child at risk of serious physical harm, damage and danger."

[3]     The sustained b-1 count states:  "On prior occasions, the child['s] . . . mother['s] . . . male companion, Arturo V[.], physically abused the child by forcing the child to defecate and then eat the child's own feces.  Further, on prior occasions, the male companion covered the child's mouth with the male companion's hand and struck the child's stomach inflicting pain and marks to the child's stomach.  Such physical abuse was excessive and caused the child unreasonable pain and suffering.  The mother knew of the male companion striking the child and failed to protect the child by allowing the male companion to have unlimited access to the child.  Such physical abuse of the child by the male companion and the mother's failure to protect the child endanger[] the child's physical health and safety, creates a detrimental home environment and places the child at risk of serious physical harm, damage, danger, physical abuse and failure to protect."

[4]     The sustained b-3 count states:  "The child[']s . . . father . . . [and his] female companion, Ruby M[.], have a history of engaging in violent altercations in the child's presence.  On prior occasions, the father and the female companion engaged in physical altercations.  On prior altercations [*sic*], the female companion struck the father.  The father failed to protect the child by allowing the female companion to reside in the child's home and have unlimited access to the child.  Such violent conduct on the part of the father and the father's female companion and the father's failure to protect the child endanger[] the child's physical health and safety and places the child at risk of serious physical harm, damage, danger and failure to protect."

10

dependent of the court under section 300, subdivisions (a) and (b)(1).

The juvenile court found the evidence "overwhelming" that mother and Arturo "physically fought all the time." With respect to Arturo's abuse of minor, the court stated, "I don't know that I've been more sad when I read something. Mother absolutely could have taken her child out of the situation with her boyfriend, but she didn't. She allowed for this to happen." As for the domestic violence between father and Ruby, the court "believe[d]" minor that Ruby hit father "all the time." The court believed that father was currently "a victim" and not "the perpetrator."

Regarding the disposition, mother's counsel stated: "On behalf of mother, mother is submitting to suitable placement and monitored visitation. I've reviewed the case plan with the mother. She is in agreement with all aspects of it, and we do believe it is narrowly tailored." Father's counsel asked the court to release minor to father's home.

The juvenile court ordered minor removed from parental custody. The court explained, "The reason the court finds that removal of [minor] from mother is necessary is because of mother's failure to protect [minor] from the physical abuse of mother's boyfriend. [¶] The reason the court finds that removal of [minor] from father is necessary is because of father's failure to protect [minor] from the physical altercations between him and his girlfriend."

The juvenile court ordered family reunification services for both mother and father and granted them monitored visitation with minor. The parents' case plans included developmentally appropriate parenting classes and individual counseling to address case issues.

11

X. *Appeals*

Mother and father each filed a timely notice of appeal from the November 18, 2021, findings and orders.

**DISCUSSION**

I. *Jurisdictional Findings*

Mother challenges the juvenile court's jurisdictional findings concerning her domestic violence with Arturo under section 300, subdivisions (a) and (b)(1) (counts a-1 and b-2) and her failure to protect minor from Arturo's abuse under section 300, subdivision (b)(1) (count b-1), arguing that the findings are not supported by substantial evidence. Father argues that substantial evidence does not support the jurisdictional finding concerning his domestic violence with Ruby under section 300, subdivision (b)(1) (count b-3). We conclude that substantial evidence supports each of the court's findings.[5]

A. <u>Applicable law</u>

Section 300, subdivision (a), authorizes the juvenile court to assume jurisdiction over and adjudge to be a dependent of the court a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent . . . ."

---

[5] A juvenile court may properly "base jurisdiction on the actions of one or both parents, and once established, the court may enter orders binding both parents. [Citation.]" (*In re H.R.* (2016) 245 Cal.App.4th 1277, 1285–1286.) Thus, "'an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence.' [Citation.]" (*Id.* at p. 1286.) For the sake of completeness, however, we address each ground for jurisdiction.

12

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of"— as relevant here—the "failure or inability of the child's parent . . . to adequately supervise or protect the child."

"While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the child to the defined risk of harm." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15 (*Emily L.*).)  Still, "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction.  The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected.  The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"Exposure to domestic violence may serve as the basis for dependency jurisdiction" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602–603 (*Cole L.*)) under both subdivisions (a) and (b)(1) of section 300.  (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599 (*Giovanni F.*) ["Although many cases based on exposure to domestic violence are filed under section 300, subdivision (b) [citations], section 300, subdivision (a) may also apply"].)

B.  Standard of review

Jurisdictional findings must be made by a preponderance of the evidence.  (§ 355, subd. (a); *Cynthia D. v. Superior Court*

13

(1993) 5 Cal.4th 242, 248.) We review those findings for substantial evidence—"evidence that is reasonable, credible and of solid value. [Citations.] We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

"Substantial evidence may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 318.)

C. Analysis

1. *Domestic violence between mother and Arturo (counts a-1 and b-2)*

Substantial evidence existed that mother had and would again expose minor to a substantial risk of suffering serious physical harm inflicted nonaccidentally or negligently within the meaning of section 300, subdivisions (a) and (b)(1), based on domestic violence.

Mother had remained with Arturo for several years even though their relationship was marked by pervasive physical violence and mother knew that Arturo physically abused minor. This "[e]xposure to domestic violence" supported jurisdiction under section 300, subdivision (b)(1). (*In re L.O.* (2021) 67 Cal.App.5th 227, 238.) When mother brandished a knife at Arturo during a fight in 2016 in minor's presence, minor was not only a bystander but became directly involved in the altercation by throwing hangers in an attempt to protect mother. If a "child intervenes during a fight to protect h[is] mother from . . . abuse,

14

the risk of harm to the child may be properly viewed as nonaccidental" and support a jurisdictional finding under section 300, subdivision (a). (*Cole L.*, *supra*, 70 Cal.App.5th at p. 603.)

Mother resists this conclusion by arguing that there was no evidence of a current risk of harm to minor—the allegations were too remote in time and there was no evidence that Arturo was a part of mother's or minor's life anymore. Certainly, "section 300 requires proof the child is subject to the defined risk of harm at the time" the jurisdictional findings are made. (*Cole L.*, *supra*, 70 Cal.App.5th at p. 601.) "While evidence of past conduct may be probative of current conditions," "previous acts of neglect, standing alone, do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur. [Citation.]" (*Emily L.*, *supra*, 73 Cal.App.5th at p. 15.)

Here, there were at least three nonspeculative reasons to believe that mother's past conduct would reoccur.

<u>First</u>, the juvenile court could reasonably find it more likely than not that Arturo would reappear in mother's and minor's lives. In August 2021, minor reported recent contact with Arturo.

<u>Second</u>, mother denied important aspects of her past domestic violence, such as that she had brandished a knife at Arturo. Her unwillingness to admit the extent of her role in the domestic violence supports "[t]he inference . . . that [s]he is less likely to change h[er] behavior in the future." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156.) Mother's "denial of domestic violence increases the risk of it recurring. [Citations.]" (*Ibid.*)

<u>Third</u>, during DCFS's investigation, mother accused Ruby of "embarrassing" her on social media by calling her names and

posting pictures of her. Mother intended to resolve this conflict by "'fighting'" Ruby. This constituted substantial evidence that mother was still likely to engage in violence, including with individuals who had significant contact with minor. Given minor's past attempt to protect his mother during a violent confrontation, a significant risk existed that minor would become involved in a future altercation and be exposed either nonaccidentally or negligently to serious physical harm. This is particularly true considering minor's apparent access to firearms.

   2. *Domestic violence between father and Ruby (count b-3)*

  With respect to father, substantial evidence supported the finding that father was currently failing to protect minor by exposing him to father's violent relationship with Ruby, subjecting minor to a significant risk of harm within the meaning of section 300, subdivision (b)(1). Minor reported witnessing daily fights between father and Ruby, with Ruby hitting father. Father flatly denied the domestic violence, despite a DCFS social worker hearing the screaming of a man and woman from the direction of father's apartment and shortly thereafter observing father with "fresh scratch marks" on his neck, forearms, and forehead. As with mother, father's denial of domestic violence "increase[d] the risk of it recurring. [Citations.]" (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 156; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)

  Father makes much of the juvenile court's statement that it believed that father was currently "a victim" and not "the perpetrator" of domestic violence. But even if only Ruby was inflicting physical violence at the time, father still failed to

protect minor from daily exposure to such violence by allowing Ruby to reside in minor's home.  The risk to minor persisted regardless of who was the perpetrator and justified the court's exercise of jurisdiction.

Father also notes that no harm had befallen minor while in his care.  But actual abuse or neglect is not required for the juvenile court to exercise jurisdiction under section 300.  (*In re I.J., supra*, 56 Cal.4th at p. 773.)  "The court need not wait for disaster to strike before asserting jurisdiction.  [Citation.]  This is why the statute uses the word 'risk.'"  (*In re K.B.* (2021) 59 Cal.App.5th 593, 603.)

   3. *Mother's failure to protect minor from Arturo's abuse (count b-1)*

The details of Arturo's physical abuse of minor are egregious.  On more than 10 occasions, Arturo forced minor to defecate and then ingest his own feces.  Arturo repeatedly hit minor.  Arturo restrained minor in a cold shower in the middle of the night.  Mother knew of this abuse yet failed to protect minor from it.  Minor told mother that Arturo abused him, yet she did not believe him and allowed Arturo unlimited access to the child, thus allowing the abuse to continue.

Although mother was no longer in a relationship with Arturo at the time of adjudication hearing, minor reported, in August 2021, recent contact with Arturo.  "A parent's past conduct is a good predictor of future behavior.  [Citation.]"  (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)  The juvenile court could reasonably infer from mother's past conduct that she lacked the ability to protect minor, thus placing him at substantial risk of future harm.  (§ 300, subd. (b)(1).)

17

II. *Dispositional Order Removing Minor*

Father also challenges the evidentiary basis for the dispositional order removing minor from his custody.[6]

A. <u>Applicable law</u>

Before removing a minor from a parent's custody, the juvenile court is required to make one of five specified findings by clear and convincing evidence. (§ 361, subd. (c).) One ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child. (§ 361, subd. (c)(1).) ""'Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]' [Citation.] Actual harm to a child is not necessary before a child can be removed. 'Reasonable apprehension stands as an accepted basis for the exercise of state power.'" (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.)

---

[6] In her opening brief, mother contended that the order removing minor from her custody should also be reversed, as it lacked substantial evidentiary support. In her reply brief, mother conceded DCFS's argument that mother waived her right to challenge the removal order because mother had submitted to the suitable placement of minor at the adjudication hearing. We agree with DCFS's argument and mother's concession. (See *In re Christopher B.* (1996) 43 Cal.App.4th 551, 558 ["In dependency litigation, nonjurisdictional issues must be the subject of objection or appropriate motions in the juvenile court; otherwise those arguments have been waived and may not be raised for the first time on appeal"].)

B. <u>Standard of review</u>

We review a dispositional order removing a minor from parental custody for substantial evidence. (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) The juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof. (§ 361, subd. (c).) Therefore, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

C. <u>Analysis</u>

Minor's reporting that father and Ruby engaged in daily domestic violence, coupled with father's denial of such violence and minor's access to firearms, constituted substantial evidence from which the juvenile court could find it highly probable that minor would be at substantial risk of injury in father's custody, and that no reasonable means existed to protect him short of removal. (§ 361, subd. (c)(1); see also *In re V.L.*, *supra*, 54 Cal.App.5th 147, 155–157.)

Urging reversal of the removal order, father asserts that the evidence showed that father acted protectively toward minor, as he had sought DCFS's help concerning physical abuse of minor in mother's household. This argument merely goes to the interpretation and weight of the evidence, which we may not reevaluate. (See *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1008–1009.) Having identified substantial evidence supporting the order, "it is of no consequence that the [lower] court believing other evidence, or drawing other reasonable

19

inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted.)

**DISPOSITION**

The juvenile court's November 18, 2021, jurisdictional findings and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
HOFFSTADT

20