Filed 7/1/24  In re J.M. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | B330629 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.C.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19LJJP00279D) |
| In re A.C.,<br><br>on Habeas Corpus. | B335373<br><br>(Los Angeles County Super. Ct. No. 19LJJP00279D) |

APPEAL from an order of the Superior Court of Los Angeles County.  Jennifer W. Baronoff, Commissioner. Conditionally affirmed and remanded with directions.  Petition denied.

Anuradha Khemka, under appointment by the Court of Appeal, for Defendant and Appellant.

Children's Law Center[2] and Taylor Lindsley for minor J.M.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

A.C., the alleged father of minor J.M., appeals from the order terminating his parental rights over J.M. under Welfare and Institutions Code[1] section 366.26. A.C. argues the juvenile court erred in (1) failing to make a timely ruling on his request for presumed father status, (2) terminating his parental rights without a finding of unfitness, and (3) failing to comply with the inquiry requirements of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law. A.C. also has filed a petition for writ of habeas corpus, asserting that to the extent he forfeited any of his claims on direct appeal, such forfeiture was the result of ineffective assistance of counsel.

As to the direct appeal, we conclude A.C. forfeited his claim regarding the juvenile court's failure to declare him a presumed father. The court found that A.C. was an alleged father prior to the jurisdictional and dispositional hearing, and A.C. never filed an appeal from the dispositional order to challenge the paternity finding. We further conclude the juvenile court did not violate due process in terminating A.C.'s parental rights because the court made detriment findings against A.C. at the dispositional

_____

[1]    Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

2

hearing and interim review hearings. A.C. forfeited his right to challenge the sufficiency of the evidence supporting the prior detriment findings because he did not timely seek appellate review of any of them. As to the habeas petition, we conclude A.C.'s claim for ineffective assistance of counsel fails because it is based on his attorney's alleged errors in connection with the dispositional and interim review hearings, and habeas corpus cannot be used to collaterally attack antecedent final orders.

With respect to the ICWA claim, however, the Los Angeles County Department of Children and Family Services (DCFS) concedes there was not an adequate inquiry into whether J.M. may be an Indian child, and the matter should be remanded for the limited purpose of ensuring compliance with ICWA's inquiry requirements. Given this concession, we conditionally affirm the order terminating parental rights and remand solely for ICWA compliance. We deny the petition for writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Section 300 petition

On April 25, 2019, DCFS filed a section 300 petition on behalf of then eight-year-old J.M. and his three half-siblings. The petition alleged that the children's mother, K.C. (Mother), allowed drug dealers and users to frequent the family's home, and left the children at home unattended. DCFS later amended the petition to add counts alleging that Mother had unaddressed mental health issues, and that J.M.'s father, A.C., had a history of substance abuse and was a frequent user of marijuana. The juvenile court detained the children, and DCFS placed them in foster care. Prior to their detention, the children, along with Mother, had been staying at a park and then a hotel.

3

On May 29, 2019, Mother made her first appearance in the case. She submitted a parentage questionnaire in which she identified Joshua M. as J.M.'s father, and indicated that Joshua M. was present at the child's birth, signed the birth certificate, openly held himself out as the father, and provided financial support. The court found that Joshua M. was J.M.'s alleged father at that time.

## II. A.C.'s request for presumed father status

On June 19, 2019, DCFS interviewed A.C. He asserted that he was J.M.'s father, and was active in the child's life. He also reported that, in recent months, Mother stopped talking to him and tried to keep him from seeing his son. When A.C. heard that Mother and the children were sleeping in the park, he brought J.M. to the home that he shared with the child's paternal grandmother. J.M. stayed with A.C. for about a week until Mother demanded that A.C. return the child to her.

In his interview with DCFS, J.M. confirmed that he briefly stayed with A.C. after Mother and the children became homeless. J.M. also described A.C. in positive terms, stating, "My dad is a good guy. He lets me play the games. He takes me places and he buys me new clothes and shoes."

On July 3, 2019, A.C. made his first appearance in the case and was appointed counsel. A.C. also submitted a Statement Regarding Parentage form in which he indicated that he openly held himself out as J.M.'s father, engaged in activities with him, and provided him with financial support. A.C.'s counsel requested that the court find A.C. to be J.M.'s presumed father.

Mother's counsel objected to A.C.'s request for presumed father status. Mother claimed that A.C. had only seen J.M. twice in the past eight years, and that Joshua M. provided care for the

4

child. Noting that Mother named Joshua M. as the child's father on her parentage questionnaire, the court initially stated that it was deferring a paternity finding for J.M. until it received a copy of the birth certificate. The court also granted A.C.'s request for a paternity test. Mother's counsel then showed the court a birth certificate that identified Joshua M. as the child's father.

After reviewing J.M.'s birth certificate, the court stated that it was inclined to find both A.C. and Joshua M. to be alleged fathers at that time, and to defer making further paternity findings. In response, J.M.'s counsel asked that A.C. not be allowed visitation with the child until the court received additional information about their relationship. The court agreed, stating, "Mr. [C.'s] alleged only, so there's no visits until we can look at him even further."

On July 12, 2019, DCFS again interviewed A.C. According to A.C., Mother initially denied he was J.M.'s father. However, when he saw a picture of J.M. at nine months old, he knew the child was his son. Since then, A.C. and his family had been involved in J.M.'s life, and the child regularly visited his home. A.C. stated, "He knows all of my family and my family knows him. My mom, my stepfather, my sisters and brothers, everyone."

DCFS also reinterviewed J.M. about his relationship with A.C. J.M. again identified A.C. as his father, and confirmed that he spent weekends at A.C.'s home. He reported that he had a good relationship with A.C., and that he never knew anyone else to be his father. When DCFS spoke with Joshua M., however, he claimed that he was the child's father. Although Joshua M. initially agreed to meet with DCFS, he did not show up for his interview or respond to attempts to reach him.

At a hearing held on July 25, 2019, A.C.'s counsel requested the court grant A.C. unmonitored visits with J.M. given DCFS's report that they had a parent-child relationship. The child's counsel joined in the request. Both Mother's counsel and DCFS's counsel objected, arguing that A.C. was an alleged father and a paternity test was still pending. While noting that A.C. was an alleged father, the court granted him unmonitored visitation. The court added, however, that it was not changing any paternity findings at that time, and that there was no request that it do so.

On September 13, 2019, DCFS provided the court with the results of A.C.'s paternity test, which showed that he was J.M.'s biological father.

### III. Jurisdictional and dispositional hearing

In September 2019, DCFS informed the court that it recently discovered that A.C. had a July 2019 conviction for a drug-related offense, and that he was ordered by the criminal court to attend Narcotics Anonymous meetings. At DCFS's request, A.C. submitted to a drug test, which was negative. Based on A.C.'s criminal record, DCFS also asked him to submit to a live scan background check before having unmonitored contact with J.M. As of October 2019, A.C. had not begun visitation with J.M. because DCFS was still awaiting his live scan results.

On December 4, 2019, the juvenile court held a combined jurisdictional and dispositional hearing. A.C. was represented by counsel at the hearing, but did not appear. At the start of the hearing, A.C.'s counsel confirmed that notice to A.C. was proper, and that he was ready to proceed with adjudication of the section 300 petition. The court sustained the count based on

6

Mother's mental health issues, and dismissed all the other counts, including the count alleged against A.C.

The court then proceeded to disposition. A.C.'s counsel objected to an order for reunification services for A.C. given that he was nonoffending in the sustained petition. His counsel also requested that the court release J.M. to A.C. The court noted that A.C. was not present at the hearing, and asked where he was. His counsel responded that A.C. relied on public transportation, and that he believed A.C. was having difficulty getting to court due to the rain. He acknowledged, however, that he had not had any contact with A.C. that day.

J.M.'s counsel joined in the request that the court release J.M. to A.C., arguing that DCFS had not proven the child would be at substantial risk of harm if placed in A.C.'s care. DCFS's counsel objected to placement with A.C. DCFS's counsel noted that A.C. was not present at the hearing despite being properly noticed, had not submitted to a live scan as requested by DCFS, and had not provided any proof of his compliance with the orders in his criminal case. The court indicated that it would have been inclined to release J.M. to A.C. if he had been present and able to address the issues raised by DCFS's counsel. The court stated that it was not doing so, however, because it lacked sufficient information about A.C.'s current situation and why he failed to appear.

The court declared J.M. a dependent under section 300, subdivision (b), and removed him from Mother's custody. The court then stated, "[A]s far as the father, Mr. [C.], the court would indicate that pursuant to 361.2, although he is non-offending in the petition, the court . . . does find placement with that father at this time would be detrimental to the safety, protection, or

7

physical or emotional well-being of the child." The court ordered that A.C.'s visits with J.M. remain unmonitored, and granted DCFS discretion to liberalize the visits and to release J.M. to A.C. The court also ordered reunification services for A.C., which required him to submit to five on-demand drug tests, abide by the visitation orders, and remain cooperative with DCFS.

Although the court clerk served A.C. with written notice of his appeal rights, he did not file an appeal from the jurisdictional finding or dispositional order.

## IV.    Six-month review hearing

Due to the COVID-19 pandemic, the six-month review hearing was continued to October 2020. During this period, A.C. did not have any visits with J.M. A.C. reported that J.M.'s caregiver cancelled certain visits, and that A.C. cancelled others because he was in a car accident. A.C. also did not appear for any of his on-demand drug tests, and with few exceptions, he failed to respond to DCFS's efforts to reach him.

On October 8, 2020, the juvenile court held the six-month review hearing. Neither A.C. nor his counsel were present. The court found that the parents had not substantially complied with their respective case plans, and that continued jurisdiction over J.M. was necessary. The court also found, by clear and convincing evidence, that returning J.M. to the custody of the parents would create a substantial risk of detriment to the child. The court ordered continued reunification services for both Mother and A.C., and set the matter for a 12-month review hearing.

A.C. did not file an appeal from the findings and orders made at the six-month review hearing.

8

## V.     12-month review hearing

Over the next six months, A.C. failed to comply with his case plan.  He did not visit J.M., or submit to any court-ordered drug tests.  Despite DCFS's repeated attempts to contact him, A.C. had only one telephone call with the department during this period.  When DCFS asked about his case plan, A.C. admitted he had not complied with drug testing, and questioned why he had to do so.  DCFS recommended terminating reunification services for both Mother and A.C.

On May 12, 2021, the juvenile court held the 12-month review hearing.  A.C. did not appear, but he was represented by counsel at the hearing.  Although A.C.'s counsel previously had requested a contested hearing, he withdrew that request because he had not received any direction from his client.  A.C.'s counsel nevertheless objected to the termination of reunification services.

The court found that neither Mother nor A.C. made significant progress in resolving the problems that led to J.M.'s removal.  The court also found, by clear and convincing evidence, that returning J.M. to the custody of the parents would create a substantial risk of detriment to the child.  The court terminated reunification services for both Mother and A.C., and set the matter for a section 366.26 permanency planning hearing.

The court clerk provided A.C. with written notice of his right to seek writ review, but A.C. did not file a petition for extraordinary writ from the order setting the section 366.26 hearing.

## VI.   Section 366.26 hearing

On September 18, 2021, J.M. was placed in the foster home of Mr. and Mrs. Y., his prospective adoptive parents.  Shortly after his placement, J.M. voluntarily began referring to them as

"mom" and "dad," and reported that he was comfortable and happy in their home. Over the next year and a half, J.M. became closely bonded with Mr. and Mrs. Y., and he continued to thrive in their care. J.M. told DCFS that he felt he was part of their family, and that he looked forward to being adopted by them. Mr. and Mrs. Y. likewise were committed to adopting J.M., and providing the child with a permanent and loving home.

The court originally set the section 366.26 hearing for September 2021, but granted a number of continuances for good cause. As a result, the section 366.26 hearing did not take place until July 2023. DCFS reported that, during that one-and-a-half year period, A.C. had only sporadic contact with J.M. A.C. visited the child in person a total of four times. He also had occasional telephone calls with J.M., but they tended to be short. Mr. and Mrs. Y. observed that the calls often left J.M. disappointed because A.C. made promises to the child, but failed to keep them.

On July 6, 2023, the juvenile court held the section 366.26 hearing. A.C.'s counsel called J.M. and A.C. to testify. According to J.M.'s testimony, he had four in-person visits with A.C. since his placement in foster care. He spoke with A.C. on the telephone a couple of times a month, and their calls tended to last about three minutes. He had not seen his mother in three years. J.M. enjoyed visiting with A.C., and he would be sad if the visits ended because it was important for him to know how his father was doing. J.M. also liked living with Mr. and Mrs. Y., and wanted to be adopted by them. If a legal guardianship allowed him to continue visiting A.C., J.M. would prefer that arrangement over adoption.

In his testimony, A.C. confirmed that he only visited J.M. on four occasions. According to A.C., he initially had difficulty

10

arranging visits with DCFS. Once the visits began, A.C. struggled with several medical issues that left him bedridden for a year. A.C. also had telephone calls with J.M. two to three times a month, and he did not call more often because of J.M.'s busy schedule. A.C. opposed the termination of his parental rights because he loved J.M. and wanted his son to remain in his life.

Counsel for DCFS and counsel for J.M. joined in requesting the court terminate parental rights. J.M.'s counsel noted that the child still wished to proceed with adoption. A.C.'s counsel asked the court to consider legal guardianship rather than adoption as the child's permanent plan. After hearing the argument of counsel, the court found, by clear and convincing evidence, that J.M. was adoptable and no exception to the termination of parental rights applied. The court noted that A.C. had not consistently visited J.M., and that they did not have a beneficial relationship such that the termination of parental rights would be detrimental to the child. The court also noted that, for the past year and a half, J.M. had been in the home of "caregivers who love him and can provide him with the stability that he deserves and needs." The court terminated parental rights over J.M., and ordered adoption as the child's permanent plan.

## VII. ICWA inquiry and findings

At their first appearances in the case, Mother and A.C. each submitted a Parental Notification of Indian Status (ICWA-020) form in which they indicated that they had no known Indian ancestry. On July 3, 2019, the juvenile court found that there was no reason that J.M. was an Indian child, and that ICWA did not apply.

At a permanency planning review hearing held on May 12, 2022, the court ordered DCFS to conduct new ICWA interviews

with known relatives for its next report.  On June 16, 2022, DCFS inquired of A.C., and he denied any Indian ancestry. DCFS was unable to inquire of Mother because she did not make herself available for an interview.  At the July 6, 2023 section 366.26 hearing, the court again found that ICWA did not apply.

**VIII.  A.C.'s notice of appeal and habeas petition**

On July 6, 2023, A.C. filed a notice of appeal from the order terminating parental rights over J.M.

On February 26, 2024, after briefing was completed in his appeal, A.C. filed a petition for writ of habeas corpus.  He alleged he received ineffective assistance of counsel in connection with the dispositional and interim review hearings, and asked this court to reverse the order terminating his parental rights and remand with directions to release J.M. to him.  We issued an order to show cause why habeas corpus relief should not be granted.  In response, DCFS filed a written return to the habeas petition, and through his counsel, J.M. joined in DCFS's argument that A.C. was not entitled to relief.

In connection with the habeas petition, A.C. also filed a motion to consolidate the petition with the pending appeal, and DCFS filed a request for judicial notice of the record on appeal. No party opposes these requests.  We grant both the motion to consolidate and the request for judicial notice, and consider the habeas petition with this appeal for purposes of oral argument and decision.

## DISCUSSION

**I.  Appeal from the order terminating parental rights**

A.C. raises three arguments in his appeal from the July 6, 2023 order terminating his parental rights over J.M.  First, he argues the juvenile court failed to make a timely ruling on his

request to be declared J.M.'s presumed father. Second, A.C. contends that, because he met the requirements for presumed father status, the court violated due process by terminating his parental rights without a finding of unfitness. Third, he asserts the court erred in failing to ensure an adequate ICWA inquiry.

## A. A.C. forfeited his challenge to the juvenile court's paternity finding

A.C. argues the order terminating his parental rights must be reversed because the juvenile court erred when it deferred making a paternity finding at A.C.'s first appearance in the case, and then failed to rule on his request for presumed father status at any later point in the proceedings. DCFS asserts A.C. forfeited his challenge to the paternity finding by failing to timely appeal it or ask the juvenile court to revisit the issue. We conclude A.C. forfeited this claim because he did not timely appeal the juvenile court's July 3, 2019 finding that he was an alleged father, and in any event, he cannot show prejudicial error.

The timely filing of a notice of appeal is a prerequisite to appellate jurisdiction. (*In re A.R.* (2021) 11 Cal.5th 234, 246 (*A.R.*).) In dependency proceedings, appeals are governed by section 395, which states, in relevant part, that "[a] judgment in a proceeding under [s]ection 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1).) The judgment and first appealable order in a dependency case is the dispositional order. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re A.O.* (2015) 242 Cal.App.4th 145, 148.) " ' "A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." ' " (*In re S.B.*, at p. 532.)

13

To be timely, the notice of appeal ordinarily must be filed within 60 days of the appealable judgment or order. (Cal. Rules of Court, rule 8.406(a)(1).) It also must identify the particular judgment or order being appealed. (*Id.*, rule 8.405(a)(3).) "An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed." (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.) Thus, " '[o]nce the deadline [to appeal] expires, the appellate court has no power to entertain the appeal.' " (*In re A.O.*, *supra*, 242 Cal.App.4th at p. 148.) Additionally, "when a notice of appeal manifests a ' "clear and unmistakable" ' intent to appeal only from one order, we cannot liberally construe the notice to apply to a different, omitted order." (*In re J.F.* (2019) 39 Cal.App.5th 70, 76.) " 'We have no jurisdiction over an order not mentioned in the notice of appeal.' " (*Id.* at p. 75.)

In this case, A.C. seeks to challenge the juvenile court's alleged error in failing to make a timely paternity finding. The record, however, reflects that the court made a paternity finding on July 3, 2019, when A.C. made his first appearance in the case. At that hearing, A.C. requested that the court find him to be J.M.'s presumed father. The court instead found A.C. to be an alleged father, and deferred making a further paternity finding until it received additional information about A.C.'s relationship with J.M. A few weeks later, on July 25, 2019, A.C. requested unmonitored visits with J.M. in light of DCFS's investigation showing that they had a parent-child relationship. While the court granted the request for unmonitored visits, it made clear that A.C. was still an alleged father, and that it was not reconsidering any paternity findings at that time because there was no request that it do so. Although a DNA test later showed

14

A.C. was J.M.'s biological father, A.C. never renewed his request for presumed father status, or asked the court to revisit its earlier paternity finding. Hence, as of the December 4, 2019 jurisdictional and dispositional hearing, A.C.'s paternity status was that of an alleged father, and it remained that way through the July 6, 2023 termination of his parental rights.

Because the juvenile court found A.C. was an alleged father prior to disposition and never changed its paternity finding later in the proceedings, the time to challenge that finding was in an appeal from the dispositional order. (*In re A.O.*, *supra*, 242 Cal.App.4th at p. 148; *In re T.W.* (2011) 197 Cal.App.4th 723, 729.) However, A.C. did not file an appeal from the December 4, 2019 dispositional order, and the time for doing so long ago expired. The unappealed dispositional order is therefore final and binding, and cannot be attacked four years later in an appeal from the order terminating parental rights. Further, A.C.'s notice of appeal makes no reference to the court's paternity finding. Instead, the notice plainly states that A.C. is appealing from the termination order made at the July 6, 2023 section 366.26 hearing, where the issue of paternity was never raised. A.C. accordingly forfeited his right to challenge the paternity finding in the current appeal.

Even if A.C. had not forfeited this claim, he cannot show the paternity finding resulted in prejudicial error. Generally, "[a] father's rights and the extent to which he may participate in dependency proceedings hinge on his paternal status." (*In re H.R.* (2016) 245 Cal.App.4th 1277, 1283.) Only a presumed father is entitled to "appointed counsel, custody (assuming the court has not made a detriment finding), and reunification services." (*Ibid*.) Here, although the court found A.C. to be an

15

alleged father when he made his first appearance on July 3, 2019, it effectively treated him as a presumed father for the duration of the case. For instance, the court appointed counsel for A.C. at that initial hearing, and a few weeks later, it granted his request for unmonitored visits with J.M. At the December 4, 2019 jurisdictional and dispositional hearing, the court found it would be detrimental to place J.M. with A.C., but maintained its order for unmonitored visitation and granted A.C. reunification services. The court also made detriment findings against A.C. at the six-month and 12-month review hearings. Indeed, in his briefing on appeal, A.C. concedes that "[t]he court treated [him] as the presumed parent of [J.M.] at the disposition hearing and continued to do so throughout the case." Under these circumstances, any purported error by the juvenile court in failing to revisit its earlier paternity ruling was harmless.

**B.      The juvenile court did not violate due process in terminating A.C.'s parental rights**

A.C. next asserts that the juvenile court violated his due process rights because it did not find that he was an unfit parent prior to terminating his parental rights. DCFS argues the court was not required to make a finding of unfitness because A.C. was an alleged father, and in any event, the court made several detriment findings prior to terminating A.C.'s parental rights. Assuming for purposes of this claim that A.C. was a presumed father, we conclude the juvenile court satisfied due process by making detriment findings against A.C. at the dispositional and interim review hearings. We further conclude that, to the extent A.C. seeks to challenge the sufficiency of the evidence supporting those detriment findings, he forfeited his challenge by failing to timely seek review of the juvenile court's earlier rulings.

16

To protect parents' fundamental interest in the care, companionship, and custody of their children, due process requires that before a state may terminate parental rights, a court must find parental unfitness by clear and convincing evidence. (*Santosky v. Kramer* (1982) 455 U.S. 745, 747–748.) California's dependency system comports with this requirement because before parental rights may be terminated at a section 366.26 hearing, the juvenile court must have made prior findings by clear and convincing evidence that the parent was unfit. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256 (*Cynthia D.*).) "California's dependency scheme no longer uses the term 'parental unfitness,' but instead requires the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child." (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1211.) Thus, "[a] finding of detriment to the child is equivalent to a finding of parental unfitness." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 931, fn. 2.)

It is also well-established that the requisite finding of detriment need not be made at the section 366.26 hearing. (*Cynthia D.*, *supra*, 5 Cal.4th at p. 253; *In re D.H.* (2017) 14 Cal.App.5th 719, 730.) As our Supreme Court has explained, "[b]y the time dependency proceedings have reached the stage of a section 366.26 hearing, there have been multiple specific findings of parental unfitness. Except for a temporary period, the grounds for initial removal of the child from parental custody have been established under a clear and convincing standard [citation]; in addition, there have been a series of hearings involving ongoing reunification efforts and, at each hearing, there was a statutory presumption that the child should be returned to the custody of the parent. [Citations.] Only if, over this entire

17

period of time, the state continually has established that a return of custody to the parent would be detrimental to the child is the section 366.26 stage even reached." (*Cynthia D.*, at p. 253.)

In this case, the juvenile court made multiple findings of detriment against A.C. before terminating his parental rights. At the December 4, 2019 jurisdictional and dispositional hearing, A.C. asked the court to release J.M. to him as a nonoffending parent. In denying A.C.'s request, the court found that "pursuant to section 361.2, . . . placement with [A.C.] at this time would be detrimental to the safety, protection, or physical or emotional well-being of the child." While the court did not specify the evidentiary standard that it was applying, a detriment finding under section 361.2 must be made by clear and convincing evidence. (*In re Z.K.* (2011) 201 Cal.App.4th 51, 70.) The court made further detriment findings against A.C. at the October 8, 2020 six-month review hearing, and the May 12, 2021 12-month review hearing. In its minute order for each hearing, the court found "by clear and convincing evidence that return of the child to the physical custody of the parent(s) . . . would create a substantial risk of detriment to the child." These findings of detriment made prior to the termination of parental rights were sufficient to satisfy A.C.'s due process rights. (*In re A.S.* (2009) 180 Cal.App.4th 351, 363; *In re P.A.*, *supra*, 155 Cal.App.4th at p. 1212.)

A.C. argues the evidence did not support the findings of detriment made at the dispositional and interim review hearings. However, A.C. forfeited any challenge to the sufficiency of the evidence supporting the juvenile court's prior detriment findings because he did not seek appellate or writ review of those findings, and the time for doing so has passed. As discussed, A.C. never

18

filed an appeal from the dispositional order.  He also did not appeal the findings and orders made at the six-month review hearing.  Nor did he file a petition for writ relief from the findings and orders made at the 12-month review hearing where the court terminated reunification services and set the section 366.26 hearing.  The purpose of the forfeiture rule is "to balance the parents' interest in the care and custody of their children with the children's interest in the expeditious resolution of their custody status."  (*In re T.G.* (2015) 242 Cal.App.4th 976, 984.)  Here, A.C. had multiple opportunities to seek reversal of the juvenile court's detriment findings on the alleged ground that they were not supported by substantial evidence.  Because A.C. did not file a timely appeal or writ petition from any of those prior findings, he forfeited his right to do so in this appeal.

### C.    A limited remand is required for DCFS to conduct an adequate ICWA inquiry

A.C. contends the juvenile court erred in finding ICWA did not apply because it failed to ensure compliance with the duty of initial inquiry.  DCFS concedes it did not conduct an adequate initial inquiry because it never interviewed A.C.'s paternal grandmother, and that remand for ICWA compliance is the appropriate remedy.  We agree.

ICWA mandates that "[i]n any involuntary proceeding in a [s]tate court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and the right to intervene.  (25 U.S.C. § 1912(a).)  Similarly, California law requires notice to the child's parent, Indian custodian, if any, and the child's tribe if

19

there is "reason to know . . . that an Indian child is involved" in the proceeding.  (§ 224.3, subd. (a).)  Both juvenile courts and child protective agencies "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14.)

At the first appearance of each party, the juvenile court must inquire whether that party "knows or has reason to know that the child is an Indian child," and must "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."  (§ 224.2, subd. (c).)  Additionally, when a child protective agency takes a child into temporary custody, it must inquire of a nonexclusive group that includes the child, the parents, and extended family members "whether the child is, or may be, an Indian child."  (*Id.*, subd. (b)).  Extended family members include adults who are the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.  (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

"If the [juvenile] court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."  (§ 224.2, subd. (i)(2).)  We generally review the juvenile court's ICWA findings under the substantial evidence test.  (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

In this case, the record reflects that A.C. shared a home with J.M.'s paternal grandmother during the dependency proceedings.  It is undisputed, however, that DCFS never asked

20

the paternal grandmother about the child's possible Indian status. Because DCFS did not inquire of this known and available extended family member, as required by section 224.2, subdivision (b), the juvenile court's finding that there was no reason to know J.M. was an Indian child was not supported by substantial evidence. (See, e.g., *In re Jayden G.* (2023) 88 Cal.App.5th 301, 311; *In re J.W.* (2022) 81 Cal.App.5th 384, 389; *In re M.M.* (2022) 81 Cal.App.5th 61, 70, review granted Oct. 12, 2022, S276099.)

Appellate courts have adopted several divergent standards for deciding whether an ICWA inquiry error is prejudicial. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618.) Here, however, we need not decide which standard of prejudice applies. DCFS does not oppose a limited remand of the matter so that it can conduct an ICWA inquiry of J.M.'s paternal grandmother, and if required, proceed in accordance with ICWA's notice provisions. In light of this concession, we agree that remand for compliance with ICWA and related California law is the proper remedy.

## II.   Petition for writ of habeas corpus

In his habeas petition, A.C. alleges he received ineffective assistance of counsel in connection with the paternity findings and detriment findings made at the dispositional, six-month review, and 12-month review hearings. A.C. requests that we reverse the order terminating his parental rights and remand with directions that J.M. be immediately released to him. We conclude A.C.'s claim for ineffective assistance of counsel fails because he did not timely seek appellate or writ review of the juvenile court's paternity or detriment findings, and he cannot use habeas corpus to collaterally attack these now-final rulings.

21

Under California law, every parent facing termination of parental rights has a statutory right to competent representation. (*A.R.*, *supra*, 11 Cal.5th at p. 246; see §§ 317, subd. (b), 317.5, subd (a).) As a general rule, a parent who has not received competent representation in a dependency proceeding is entitled to raise a claim for ineffective assistance of counsel by petition for writ of habeas corpus. (*A.R.*, at pp. 247–249.) But a "crucial[] element of any successful claim to relief based on incompetent representation is the claimant's promptness and diligence in pursuing an appeal." (*Id.* at p. 253.) In dependency cases, "the failure to promptly seek relief 'may . . . preclude review of claims of ineffective assistance of counsel,' since '[n]owhere is timeliness more important than in a dependency proceeding where a delay of months may seem like "forever" to a young child.' " (*Ibid.*)

Appellate courts also have recognized that the right to habeas corpus relief is limited by the dependency order to which the claimed ineffective assistance of counsel relates and the timing of the habeas petition. (*In re Carrie M.* (2001) 90 Cal.App.4th 530, 533 (*Carrie M.*); *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1161–1163 (*Meranda P.*).) As the Court of Appeal in *Carrie M.* explained: "A petition for writ of habeas corpus in a dependency matter raising a claim of ineffective assistance of counsel does not lie from a final order. [Citations.] An order is final when the time for appeal has expired and no timely appeal has been filed . . . . [Citations.] It is appropriate, however, to raise the issue of ineffective assistance of counsel by petition for writ of habeas corpus filed concurrent with an appeal from a final order. [Citation.] The claim of ineffective assistance of counsel must relate to the order appealed from. [Citation.] Habeas corpus may not be utilized to challenge antecedent final

22

orders.  [Citation.]  Thus, for example, a claim of ineffective assistance of counsel in connection with jurisdiction and disposition orders may be raised in a petition for writ of habeas corpus filed in connection with an appeal from the disposition order.  [Citation.]  The same claims may not be raised by a habeas corpus petition filed in connection with an appeal from an order terminating parental rights." (*Carrie M.*, at pp. 533–534.)

In *Carrie M.*, a mother appealed from the section 366.26 order terminating her parental rights.  (*Carrie M.*, *supra*, 90 Cal.App.4th at p. 532.)  She also petitioned for a writ of habeas corpus, seeking reversal of the termination order on the ground that she received ineffective assistance of counsel in connection with the section 366.26 hearing.  (*Carrie M.*, at p. 532.) The Court of Appeal held that the mother was entitled to seek habeas corpus relief.  (*Ibid*.)  The Court reasoned that "[b]ecause the termination order is on appeal and not yet final, habeas corpus review will not delay finality of the termination order." (*Id*. at p. 535.)  The court further reasoned that, "[b]ecause the ineffective assistance of counsel claim relates only to the termination order, review of antecedent final orders is not required." (*Ibid*.)

In contrast, in *Meranda P.*, a mother sought to challenge prior dispositional and interim review orders by filing an appeal from the termination order and a concurrent habeas petition. (*Meranda P.*, *supra*, 56 Cal.App.4th at p. 1146.)  She claimed that when the juvenile court "made each of these prior orders she was either wrongly denied counsel or was incompetently represented by appointed counsel." (*Ibid*.)  She also argued that her failure to timely appeal these orders "was itself the result of the lack or inadequacy of counsel." (*Id*. at p. 1151.)  The Court of Appeal

held that the mother was barred from challenging any antecedent final orders. (*Id*. at p. 1146.) The Court reasoned that "at some point the interests of a parent, and therefore the correction of purported error which operates to the detriment of the parent, must give way to the interest of the child in a stable, secure, long-term, continuous home environment." (*Id*. at p. 1160.) The Court concluded that, "if a parent, for whatever reason, has failed to timely and appropriately raise a claim about the existence or quality of counsel received at a proceeding antedating the .26 hearing, we will apply the waiver rule to foreclose the parent from raising such an objection on appeal from the termination order." (*Ibid*.) The Court also concluded that the waiver rule "applies equally to the mother's habeas corpus petition" because "[t]he now paramount interests of the child in a stable, secure, long-term, continuous home environment . . . would be no less subject to subversion by a habeas petition than they would be by a direct appeal." (*Id*. at p. 1163.)

In his habeas petition, A.C. asserts that he was denied effective assistance of counsel because his appointed counsel erred in failing (1) to request a presumed father finding at the dispositional and interim review hearings, (2) to participate in the six-month review hearing, (3) to advise A.C. of his right to file an appeal from the detriment findings made at the dispositional and six-month review hearings, and (4) to advise A.C. of his right to file a writ petition to challenge the detriment finding made at the 12-month review hearing. Each of his counsel's alleged errors thus occurred in connection with the dispositional or interim review hearings. As discussed, however, A.C. never filed an appeal from the orders made at the dispositional and six-month review hearings, or a writ petition from the order made at the 12-

24

month review hearing where the section 366.26 hearing was set. Because these unappealed antecedent orders are now final, A.C. cannot use habeas corpus to collaterally attack them through a claim for ineffective assistance of counsel.

A.C. argues that application of the waiver rule in this case would offend due process. The waiver rule, also known as the forfeiture rule, is not absolute, and "must not be applied if 'due process forbids it.' " (*In re T.G.*, *supra*, 242 Cal.App.4th at p. 985.) In most cases, however, the rule "does not infringe upon a parent's due process rights because of the numerous safeguards built into the dependency system." (*Ibid*.; see *In re Janee J.* (1999) 74 Cal.App.4th 198, 208 (*Janee J.*).) For the due process exception to apply, the parent must show there was a defect in the proceedings that "fundamentally undermined the statutory scheme" so as to prevent the parent "from availing himself or herself of the protections afforded by the scheme as a whole." (*Janee J.*, at p. 208.) Moreover, the defect "must go beyond mere errors that might have been held reversible had they been properly and timely reviewed." (*Id.* at p. 209.) "[R]esort to claims of ineffective assistance as an avenue down which to parade ordinary claims of reversible error is also not enough" to avoid the waiver rule. (*Ibid.*) Therefore, "in the usual case, application of the waiver rule will not offend due process." (*Id.* at p. 208.)

A.C. cites *In re S.D.* (2002) 99 Cal.App.4th 1068 (*S.D.*) to support his claim that the waiver rule should not apply, but that case is distinguishable. In *S.D.*, the Court of Appeal declined to apply the rule because the ineffective representation was the failure to recognize that jurisdiction was lacking. The juvenile court asserted jurisdiction solely on the ground that the parents were incarcerated and unable to arrange care for their child. (*Id.*

at pp. 1070–1071.)  The mother's counsel conceded that jurisdiction was proper based on a patent misunderstanding of the law, and the record compelled a conclusion that the mother was able to arrange for child's care.  (*Id.* at pp. 1077–1078.) The Court of Appeal characterized the matter as an "unusual dependency case" that "*never should have been one.*"  (*Id.* at p. 1070.)  It noted that "the error here was entirely legal, and quite fundamental" (*id.* at p. 1080), and that "[n]one of the 'safeguards' built into the system could derail [the] case once counsel's initial error sent it down the dependency track" (*id.* at p. 1081).  Under those unique circumstances, the court permitted the mother to raise a belated challenge to jurisdiction in an appeal from the order terminating parental rights.  (*Id.* at pp. 1080–1081.)

Here, A.C. has not demonstrated there was a fundamental defect in the proceedings that went beyond mere reversible error. The juvenile court asserted jurisdiction under section 300, subdivision (b), based on Mother's mental health issues.  In a prior appeal, Mother challenged the sufficiency of the evidence supporting jurisdiction over J.M., and in a nonpublished opinion, this court affirmed.  (*In re K.C.* (Dec. 18, 2020, B302935) [nonpub. opn.].)  While A.C. contends the juvenile court made erroneous paternity and detriment findings that prevented him from obtaining custody of J.M., he does not claim that jurisdiction was improper as a matter of law.  Instead, this case is similar to *Janee J.*, where the Court of Appeal applied the waiver rule to preclude a parent's claim for ineffective assistance of counsel in an appeal from the order terminating parental rights.  (*Janee J.*, *supra*, 74 Cal.App.4th at pp. 210–212.)  Like A.C., the mother in *Janee J.* argued that the juvenile court failed to make adequate

26

detriment findings from disposition through the review hearings, and that her counsel rendered ineffective assistance by failing to object or to seek appellate review.  (*Id*. at pp. 210–211.)  The Court of Appeal concluded that the mother waived her right to challenge those findings because she had not shown the alleged errors "fundamentally prevented her from enjoying the multiple protections provided by the dependency scheme."  (*Id*. at p. 211.)

We conclude the waiver rule applies in this case.  The totality of the record shows that A.C. was provided with notice and an opportunity to appear before the juvenile court and to assert a position on his paternity status and J.M.'s placement.  A.C. also was provided with notice of his right to file an appeal from the dispositional order, and his right to file a writ petition from the order setting the section 366.26 hearing.  The record further reflects that, at the time A.C. filed the current appeal to challenge these earlier final orders, J.M. had been in the care of his prospective adoptive parents for close to two years, had found security and stability in their home, and wished to be adopted by them.  While A.C. claims his counsel's inadequate representation caused him to not timely seek appellate or writ review, he has not established that the alleged errors "fundamentally undermined the statutory scheme" so as to prevent him "from availing himself . . . of the protections afforded by the scheme as a whole."  (*Janee J*., *supra*, 74 Cal.App.4th at p. 208.)  Under these circumstances, A.C. is not entitled to habeas corpus relief based on his claim for ineffective assistance of counsel.

## DISPOSITION

The petition for writ of habeas corpus is denied.  The juvenile court's section 366.26 order terminating parental rights over J.M. is conditionally affirmed, and the matter is remanded

27

for compliance with ICWA and related California law.  On remand, the court must promptly direct DCFS to comply with its duty of inquiry in accordance with section 224.2 by interviewing J.M.'s paternal grandmother about ICWA.  If that information establishes a reason to know that an Indian child is involved, notice must be provided in accordance with ICWA and section 224.3.  The court must determine, on the record, whether the ICWA inquiry and notice requirements have been satisfied and whether J.M. is an Indian child.  If the court determines J.M. is an Indian child, it must vacate its order and conduct a new section 366.26 hearing, as well as all further proceedings, in accordance with ICWA and related California law.  If not, the court's original section 366.26 order shall remain in effect.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

GRIMES, J.

28